**STATE of Missouri, Respondent,**

v.

**Larry AKERS, Appellant.**

**No. WD 36728.**

Missouri Court of Appeals,
Western District.

Sept. 30, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 23, 1986.

Application to Transfer Denied
Feb. 17, 1987.

Sean D. O'Brien, Public Defender, David Fry, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Lee A. Bonine, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., SHANGLER, J., and NORMILE, Special Judge.

SHANGLER, Judge.

The defendant Larry Akers was convicted by a jury of murder in the second degree and of armed criminal action. The jury returned punishments of thirty years and fifteen years, respectively, which were imposed as consecutive sentences.

The victim, Howard Moore, was found shot and dead on the floor of his office at the Independence Sanitarium and Hospital on February 13, 1984, at 8:35 a.m. Moore was the property manager of Health Care Systems, Inc., a Sanitarium subsidiary, and Akers was a subordinate as a property maintenance supervisor. Interviews at the scene prompted the officers to find Akers for interrogation, and that quest led them first to his home, and then to that of his son. Akers was not to be found at either

residence, but a glimpse by Officer Fowler through the back window of a pickup truck parked in the driveway of the latter residence disclosed a long-barreled revolver. The vehicle was entered, and the gun was retrieved. The weapon, a .22 caliber Ruger revolver, had been purchased by Akers on July 13, 1975. The cause of death was injury from a shot to the head of the victim. A forensic expert gave opinion that the bullet removed from the head of victim Moore could have been fired from the weapon seized from the pickup truck.

The defendant Akers contends on appeal—among other grounds—that the discovery and subsequent seizure of the handgun was the product of a search conducted without a warrant, and otherwise not justified by any exception to search without a warrant—and hence the evidence was illegal under the Missouri and Federal Constitutions.

The motion to suppress discloses that the discovery and caption of the handgun by the police culminated from this train of events:

The police were summoned to the eighth floor of the Independence Sanitarium and Hospital where the body of Howard Moore was found on the floor of the office by one Oddo, who came to keep an 8:45 a.m. business appointment on February 13, 1984. The response was by police detectives Pollard, Fowler and Cavanah, who arrived at about 9:15 a.m. They found Moore riddled by three bullets, and already dead. Cavanah learned from Alma Wilkerson, residential property manager under Moore, and from Mark Anderson, property maintenance worker under Akers, that Akers harbored discontent against Moore. Wilkerson related to the police that she had talked to Akers the day before the homicide at church and that Akers "was upset over the fact that their rent had just been raised and that Howard Moore was—he was in charge of raising the rent."[1] Akers told her then [Wilkerson related to detective Cavanah] that "he was going to go talk to Howard Moore the next morning [February 13, 1984] about if he could get an agreement made where he could get the rent, you know, lowered, and that he was just basically going to talk to Howard Moore the next morning." Anderson informed detective Cavanah, there at the scene of the homicide, that Akers and Moore "did not get along, that they had had problems in the past ... both personal problems and employee-employer problems, but that it was known that they did not get along and that there were problems between them." Anderson informed detective Cavanah also that Akers "should have been there at that time working, and he was a bit concerned that he was not there." Anderson told the detective that he knew Akers "had some personal problems, that he was a heavy drinker, that he was upset over the fact that the rent had been raised, and that his wife had just come into the hospital and that she was very upset and crying." Cavanah shared this information with Fowler. The detectives learned also that Akers was driving "the company truck," described to them as a 1973 Chevrolet Cheyenne Supertech pickup. They were also given the license number. They had no intimation, however, that Akers had access to a weapon. They commenced their quest for Akers as a "possible suspect" in the homicide of Howard Moore, although [as expressed by Cavanah] whether Akers would have been arrested when found "depended on some other variables."

An attempt to interview Ms. Akers, who was then interned at the Sanitarium, failed, according to detective Fowler. The detectives Fowler and Cavanah then proceeded to the Akers home—about four or five houses down the street from the Sanitarium. It was by then eleven o'clock in the

---

1. The evidence was that the Independence Sanitarium and Hospital was an adjunct of the Reorganized Church of Latter Day Saints, and, in turn, owned properties managed by Health Care Systems, Inc.—the immediate employer of the principals Akers and Moore, as well as numerous trial witnesses. The residences occupied by Akers and the Akers son were among those owned by the Sanitarium and managed by Health Care Systems, Inc. through victim Moore.

morning. The detectives rapped first on the front, and then on the rear door, but with no response. They peered through the windows and could see only a bottle of whiskey and partially consumed drink. They did not enter. They then proceeded to the home of the Akers son, directly behind the home of the father. There they observed parked on a grassy area behind the house the vehicle described as the one Akers drove in his employment. It appeared to detective Cavanah that the "truck just pulled in recently because there was fresh tire marks in the soft ground, the yard, and it kind of led up to the back where the truck was parked." They went to the front door, but there was no response to the knock. The door was open a fraction of an inch, so that detective Cavanah could see "a set of car keys laying on a counter inside." He called for Akers, announced themselves as police officers, but there was no response. Cavanah went around to the rear, knocked on the door, had no response; and then went to the apartment upstairs, knocked, and again had no response. As he returned to join the other detective he heard Fowler exclaim: "The gun's here." Fowler told him that "he had found a gun on the back seat of the truck, that he could see a gun sitting there." Fowler was then "looking in the back window of the truck." The doors of the vehicle were still closed. Cavanah looked for himself and "could see that there was a gun laying on the floorboard from the back window." He thereupon notified his superiors that "we had a gun located." Fowler explained that after the attempt to find Akers at the residences was without success, he went over to the vehicle "looking for a gun." Fowler was aware that Moore had been shot "probably by a .22 caliber gun." He looked first through the window "from the driver's side," saw nothing, and "next looked through the back window," and "could see a long-barreled revolver on the floor in the three- to four-inch space between the seat and the back of the cab." The weapon was not disturbed until after the completion of police photographs some minutes later.

A short time later, other officers entered the residence, found Akers unconscious, and removed him to a hospital. Akers was then placed in arrest.

The defendant Akers and subordinate employee Riley also gave testimony on the motion to suppress. Akers testified that he drove the pickup truck for Health Care Services, Inc., in the course of the employment duty, kept the only two sets of keys to the vehicle, and maintained exclusive control over it. Akers testified also that the mechanism to move the front seat of the truck was inoperative. He succeeded, after difficult manipulation, to move the seat back on the track so as to allow leg space and was never thereafter able to move forward again. That was the position of the front set up to September 12, 1984—the day before the Moore homicide. Richard Riley, an employee at Health Care Services, Inc., subordinate to Akers, testified that the company truck was regularly kept at the Akers residence since part of that dwelling was used as a company warehouse. He confirmed that Akers was the custodian of the keys and that for Riley to use the truck, it was necessary to obtain the keys from Akers. The seat of the truck was "in the full back position," and would not move forward.

The trial court determined that the plain view doctrine applied to validate the discovery of the weapon, and then the caption of the weapon and shells which the entry into the truck and the search of the interior also disclosed.

 The defendant Akers argues that the order of the trial court to deny the motion to suppress the gun and shells errs, both as to fact and law. He argues that the discovery of the handgun could only have been the product of a search conducted without a warrant because the fact indispensible to the operation of the plain view doctrine—that the gun was visible to an observer through the back truck window—was an inference "against the greater weight of the evidence." Akers argues that certain internal inconsistency within

the officer testimony as well as the contradiction between the officer evidence that the seat was in the forward position—so as to allow the discovery of the gun in the four-inch gap between the seat and the rear of the truck—and the Riley testimony [and of Akers himself] that the seat was in the back position, fixed and inoperable—so as to allow only a one and one-half to two inch gap—so undermines the probity of the evidentiary predicate for the inference of plain view as to compel the conclusion that the gun was discovered only after entry into the truck—and hence was unlawful evidence.

The argument simply discounts the officer testimony, affirmed and reaffirmed, that Fowler discovered the weapon through the back window of the truck after a glimpse through the driver's window disclosed neither occupant nor weapon. The argument, in effect, adopts the Riley and Akers testimony and denies to the factfinder the probative and favorable inferences of the evidence in opposition. There were occasional ostensible inconsistencies in the officer testimony as to the extent to which the gun was visible to an external observer, but even the most favorable view of the testimony by Riley and Akers concedes that the seat, even if fixed in the back position [as that evidence has it], allowed a one and one-half to two inch gap to reveal an object on the floor. The court resolved that question of fact in favor of the officer testimony, and no doubt was aided by the numerous photographs of the truck situs, of the gun in the original milieu of the truck interior, and other projections. These exhibits were before the trial court, and since they were not filed as part of this appeal [Rule 81.15], we surmise they were of no benefit to the complainant Akers.

A search without a warrant is *per se* unreasonable under the Fourth Amendment—subject only to a few well defined exceptions. The automobile exception is among them. *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982). That exception enables the police with probable cause to conduct a warrantless search of a vehicle under exigent circumstances: It distinguishes vehicles from fixed premises because the mobility of vehicles tends to render a warrant in advance of search impractical, and hence a search without a warrant a matter of exigency. *Chambers v. Maroney*, 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970). Hence, a vehicle lawfully stopped, which the police have probable cause to believe contains contraband, weapons, or evidence of crime, may be searched in every part without a warrant to achieve the object of the search. *United States v. Johns*, 469 U.S. 478, 105 S.Ct. 881, 885[3, 4], 83 L.Ed.2d 890 (1985). The automobile exception, as evolved, rests not only on the exigency of inherent mobility, but on a diminished expectation of privacy from the subjection of a licensed vehicle "to a range of police regulation inapplicable to a fixed dwelling." *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406 (1985).

A police officer engaged in lawful activity who observes a suspicious object in plain view may seize it immediately, and without a warrant. *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). That is because the seizure of property in plain view involves no invasion of privacy, and so is presumptively reasonable assuming, of course, that there is probable cause to link the property with criminal activity. *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). The seizure of property in plain view is justified, therefore, not as an independent exception to the warrant clause of the Fourth Amendment, but "simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *Texas v. Brown*, 460 U.S. 730, 738–739, 103 S.Ct. 1535, 1541, 1542, 75 L.Ed.2d 502 (1983). A valid reliance on plain view to seize without a warrant assumes (1) a lawful discovery—that "the initial intrusion which brings the police within plain view of such an article" is itself lawful, (2) that the discovery is inadvertent, and (3) that "it is immediately apparent to the police that they have evidence before them." *Cool-*

*idge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1970); *State v. Strickland,* 609 S.W.2d 392, 395[9, 10] (Mo. banc 1980).

The articulated order to deny the motion to suppress invoked *both* the automobile exigency exception and the evidence in plain view postulate to validate the gun and shells as evidence.

█ The defendant Akers argues [as we make it out] that the gun was not subject to seizure without a warrant even though observed in plain view since that evidence was itself enclosed within a protected area [presumably, the truck], so that intrusion to seize was not lawful absent exigent circumstances, and there could be no such urgency as to a vehicle parked and unoccupied.

Indeed, the plain view vantage justifies the discovery and seizure of criminal evidence without a warrant on the premise that there can be no expectation of privacy as to what a person knowingly exposes to public view. *Texas v. Brown,* 460 U.S. at 741, 103 S.Ct. at 1542; *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967). Thus, in the absence of a privacy interest in the property already relinquished, or of an exigent circumstance to excuse a warrant—"plain view *alone* is never enough to justify the warrantless seizure of evidence." *Coolidge v. New Hampshire,* 403 U.S. at 468, 91 S.Ct. at 2039. An officer who discovers in plain view a container protected by a privacy interest, therefore, needs a justification other than the discovery itself in order to enter that enclosure without a warrant to seize the contents. W. LaFave, 2 Search and Seizure § 7.5, at 590 [and cases cited] (1978). In the case of a mobile container [such as a vehicle] subject to public licensure, the mobility of the object itself and the lessened expectation of privacy from the regimen of licensure suffice as the exigency to justify the police to enter and seize property in plain view within the enclosure when there is reasonable cause to believe that the property constitutes criminal evidence or otherwise offends against the law. *United States v. Johns,* 105 S.Ct. at 885[3, 4]; *State v. Ferguson,* 678 S.W.2d 873, 876[3] (Mo.App.1984).

Nor is there requirement—as the Akers argument intimates—that the warrantless search of the vehicle be contemporaneous with its lawful seizure. *Texas v. White,* 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1975). Nor does the justification to conduct such a search vanish once the vehicle is rendered immobile. *Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 3080, 73 L.Ed.2d 750 (1982). The legality of the search was determined by the probable cause for the officer to believe that the gun espied in plain view through the truck back window was the weapon used to kill Moore. In such a setting, the expectation of privacy " 'in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband [or evidence of crime].' " *United States v. Johns,* 105 S.Ct. at 885[3, 4]. In such a setting, therefore, the probable cause to believe that the weapon discovered in plain view is the instrument of crime needs no exigent circumstance or other justification for a warrantless entry, search and seizure. The search and seizure conducted by the police on that probable cause is no less than a warrant would have permitted, hence the fact that the truck had been rendered immobile by the police custody—so that the flight of the truck [and the evidence] was no longer an exigent concern—did not require that a warrant precede a lawful search and seizure. *Id.* at 885[3, 4].

The defendant does not argue—nor could he—that neither the police entry upon the residential premises of son Akers or their presence at the precise vantage from which the gun was disclosed to plain view was not lawful. It is altogether proper for police with legitimate business to enter the areas of the curtilage open to the public. W. LaFave, 1 Search and Seizure § 2.3 at 304 [and cases cited] (1978). Thus, it is altogether proper for the police to call at a particular house to seek admittance in the course of a criminal investigation, or other

official business. *Ellison v. United States*, 206 F.2d 476, 478 (D.C.Cir.1953); *Gilreath v. State*, 279 S.E.2d 650, 658[1] (Ga.1981). There is no reason to suppose that the course the police took—first to the front door and then, in absence of response, to the back door, and around to the front again—was not the normal means of public access to the residence doors. There is no reason to suppose that the vehicle was not sited immediately along that path or that the contents were not easily open to view—albeit with some adjustment in the posture of the observer.[2] *State v. Rand*, 430 A.2d 808, 819[27–29] (Me.1981). Nor does the defendant contest that the other elements of the plain view justification for the seizure of the evidence without a warrant were not present. The discovery of the gun was inadvertent—that is, the officers did not know in advance the location of the evidence so that the seizure was not merely a pretense to evade the warrant requirement. Also, it was immediately apparent that the gun was of the kind used to commit the crime. The gun the police discovered in plain view and the shells the search later revealed were proper evidence. *Texas v. Brown*, 460 U.S. at 743, 103 S.Ct. at 1543; *State v. Strickland*, 609 S.W.2d at 395[9, 10].

■ Akers argues next that the proof was insufficient to convict because there was no substantial evidence from which the jury could infer he was at the scene of the crime, bore a motive to commit the crime, or that he committed the crime with willful premeditation. Akers cites the principle that in a circumstantial evidence case, as here, "the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence." *State v. Franco*, 544 S.W.2d 533, 543[1–4] (Mo. banc 1976). Akers enlists that principle to argue the effect of *State v. Knabe*, 538 S.W.2d 589 (Mo.App. 1976)—as Akers perceives it—that circumstantial proof of the physical presence of the accused at the crime scene is given a more stringent scrutiny than usual by an appellate court in the determination of the sufficiency of that element of the crime. The more correct statement of principle is rendered in *State v. Stapleton*, 518 S.W.2d 292, 296[1] (Mo. banc 1975)—to which *Knabe* alludes—

*Although the test for determining the sufficiency of evidence to sustain a conviction is more stringent in a circumstantial evidence case* [citation omitted], *the state's evidence, after conviction, must be accepted as true,* together with all reasonable inferences deducible therefrom, and all evidence and inferences to the contrary must be disregarded. [citation omitted]. [emphasis added]

In a word, whatever the added stringency of internal consistency circumstantial proof beyond a reasonable doubt inherently imposes upon the proponent of accusation, prosecution review for sufficiency of the evidence to convict does not vary—whether the proof be by direct or circumstantial evidence. *State v. Brown*, 660 S.W.2d 694, 698[9–12] (Mo. banc 1983). In that review, we observe the premise that the prosecution "is not required to conclusively establish guilt nor exclude every hypothesis of innocence, even in a circumstantial evidence case." *State v. Overkamp*, 646 S.W.2d 733, 737[10–12] (Mo.1983).

■ There was substantial evidence that Akers was at the scene at the time the homicide was committed. The day before at church service, Akers had expressed to coworker Wilkerson his agitation about the raise in rent Moore had imposed and that Akers intended to speak with Moore about

---

2. The numerous photographs of the truck within the residential milieu where the vehicle was discovered are not before us. Neither does any testimony or other evidence locate the vehicle in terms of the curtilage when it was observed and the gun discovered. We do not intimate that had the photographs or other evidence established that the vehicle was in an area of the curtilage to which an expectation of privacy attached—and hence not open to the public—that the defendant Akers enjoyed status to contest that intrusion. The defendant does not tender such an issue.

it the next morning—February 13, 1984, the day of the homicide. That morning, at about 8:15 a.m., Alma Fairbanks, a Health Care Systems employee, under the supervision of defendant Larry Akers, proceeded to the eighth floor office of property manager Moore, but remained outside since Moore was then in conversation with another person. The door was ajar and Ms. Fairbanks could see Moore standing within, but not the other person. Moore was addressing a person named "Larry." Moore "looked angry," his face was "strained," and the tone of his voice was "rather harsh." Larry did not speak, and she heard nothing he may have said. Alma Fairbanks then left. Thereafter, Frank Oddo, who had arrived for a business appointment at about 8:35 a.m. found Moore on the floor of the office, wounded and bloody. Akers did not report as usual for work that morning, nor gather with Wilkerson, Anderson and the others at the coffee shop to prepare for the work of the day, as was their custom. The police came to the scene and immediately sought Akers for interrogation. It was determined there that the homicide weapon was a .22 magnum caliber revolver. Akers was sought at his residence, and then at the residence of his son. The company truck, which Akers drove in the performance of the work duty, was discovered there, as was a gun. A bullet found in the office of victim Moore was matched to the Akers gun. Akers was then apprehended inside the residence of the son, the very place where the vehicle Akers habitually used for work purposes—and which harbored the gun—was found. The evidence, taken most favorably to the prosecution case, sufficed to sustain the proof of every element of the offense, and hence—conviction.

The motive, albeit not an element of murder, bears on the substantive proof because the absence of motive—once shown—"tends towards innocence." *State v. Stapleton*, 518 S.W.2d at 296[2]. Thus, evidence of motive or want of it is a circumstance "to be given such weight by the jury as they consider it entitled to under all the circumstances." *State v. Abbott*, 654 S.W.2d 260, 268[2–6] (Mo.App.1983). Akers did not take the stand at the trial of the offense to the jury—made no protestation of innocence. Nor was there any other source of evidence from which the want of motive was palpable. There was, on the other hand, evidence of a ready motive: revenge for the increase in the rent imposed by Moore as well as for the chastisement of Akers the week before for drinking on duty.

Akers contends also that the evidence did not prove a murder willful and premeditated. To prove murder, the premeditation need exist but for a moment only. *State v. Williamson*, 657 S.W.2d 311, 312[3–6] (Mo.App.1983). In the context of § 565.004, then extant and under which Akers was charged, premeditation means " 'thought of beforehand any length of time, however short' " and " '[w]illful simply means intentional.' " *State v. Powell*, 630 S.W.2d 168, 170 (Mo.App.1982). A deadly weapon used in such a way as will usually or reasonably produce death or put life in jeopardy gives rise of a presumption of an intent to kill. *State v. Goforth*, 535 S.W.2d 464, 467[3, 4] (Mo.App.1976). The killer fired three shots. The murder weapon was a single-shot revolver, so that the cock of the hammer and the press of the trigger preceded such shot. The evidence sufficed to prove that the use of the weapon was willful and with premeditation.

■ Akers contends, finally, that the compliance by the court with the jury request made during deliberation for the trial exhibits—the gun, among them—prejudiced a fair trial. Akers acknowledges that decision to allow exhibits into the jury room is a matter of discretion for trial court, but argues that since "there were *no* contested issues for which a physical examination of the handgun was required," the display was to no legitimate purpose and could only work to "impassion" the jurors against the defendant. The proof of the offense by the prosecution, as Akers has recalled to us for other purposes, was altogether circumstantial. The only direct physical link of the defendant to the crimi-

nal event was the revolver. It was received in evidence as the handgun from which one of the bullets retrieved at the scene was fired. It was owned by Akers. Thus, the exhibit was cogently relevant to the case. The jury requested all of the exhibits, and Akers offers only surmise that the decision of the trial court to comply caused him an injustice. The jury had already handled the weapon during the testimony of firearms expert Nilges. There is no contention that it engendered prejudice then, and we cannot say that it engendered prejudice when repeated. The decision of the trial court to allow the jury the exhibit during deliberations was not an abuse of discretion. *State v. Stewart*, 615 S.W.2d 600, 606[6] (Mo.App.1981).

The judgment is affirmed.

All concur.