**STATE of Missouri, Respondent,**

v.

**William F. EDWARDS, Appellant.**

**No. WD 57870.**

Missouri Court of Appeals, Western District.

Dec. 19, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30, 2001.

Bruce W. Simon, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Jefferson City, for respondent.

Before Presiding Judge SMART, Judges ELLIS and LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Appellant William Edwards was convicted after a bench trial on September 8, 1999, of attempted manufacture of a controlled substance, in violation of Section 195.211 RSMo Cum.Supp.1998, and was sentenced to a term of ten years imprisonment. Mr. Edwards appeals his conviction, arguing that the trial court erred and abused its discretion in admitting physical evidence seized from his home following a search pursuant to a search warrant. He argues that the seizure of these items was the product of an unlawful search and seizure, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, and Article 15, Section 1 of the Constitution of the State of Missouri, in that the police had no permission to come onto his property and question him in the front patio area of his home. Consequently, he argues, the admissions he made were not admissible and the warrant issued based on these admissions was invalid. This means, he further asserts, that the evidence seized in the search pursuant to the warrant should have been excluded as fruit of the poisonous tree.

We disagree. The evidence in this case fully supported the determination that the front driveway, front walk, and front patio areas of Mr. Edward's home were open to the public, that Mr. Edwards had no reasonable expectation of privacy in those areas, and thus that the police were lawfully present in those areas when Mr. Edwards made his admissions. It was therefore entirely proper to use those admissions as the basis for obtaining a warrant, and the evidence discovered in the search was properly admitted. Affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The evidence, considered in a light most favorable to the judgment, was as follows:

On March 25, 1998, Detective Mark Braden of the Platte County Sheriff Department's narcotics unit received a .fax from the TIPS hotline, stating that an anonymous informant had told them that an individual named Bill Edwards was involved in a large marijuana cultivating operation in the attic of his home, located at 19435 Fry Road. The fax said that the anonymous informant gave specific information that Mr. Edwards was a paraplegic and that he had a blue van with a handicap license.

On the following day, Detective David Kissee of the Platte County Sheriff's Department used law-enforcement databases to verify some aspects of the anonymous tip given to the TIPS hotline, including that the occupant of 19435 Fry Road was named William Edwards, and that William Edwards' driving records showed restrictions that were consistent with Mr. Edwards being confined to a wheelchair. After verifying these facts, Detective Braden and Detective Kissee decided to further follow up on the tip by going to 19435 Fry Road, accompanied by Deputy Grady Matthews and Deputy James Smith of the Platte County Sheriff's Department. Detectives Braden and Kissee were attired in plain clothes, and Deputies Matthews and Smith were in uniform. The four officers drove to the residence at 19435 Fry Road, parked in the driveway, and proceeded along a walkway toward the front door of the residence.

While progressing along the walkway toward the front door, the officers passed an open door leading into the garage. Detective Braden knocked on the frame of the door and called out, "is anybody

home?" While standing outside the door frame waiting for someone to answer, Detective Braden observed the contents of the garage, which included a green hand-held pump sprayer, boxes labeled "fertilizer," and boxes labeled "root cubes." Detective Braden recognized all of these items to be commonly used in the cultivation of plants.

Because the officers received no answer at the open door to the garage, they continued toward the front door of the residence. Detective Braden knocked on the front door and rang the doorbell, but received no answer. As the officers stood on the front walk trying to determine what to do next, Mr. Edwards came around from the left side of the house in his wheelchair. He stopped his wheelchair on a patio area that was in front of the house and to the right of the front door. Detective Braden asked him his identity, and he confirmed that he was "Bill Edwards." Detective Braden knelt down beside Mr. Edwards, displayed his badge and identification, and informed Mr. Edwards that he was investigating a tip that Mr. Edwards was growing marijuana in his house. Detective Braden asked Mr. Edwards if he was, indeed, growing marijuana in his house. Mr. Edwards answered "no," but, when Deputy Grady Matthews observed aloud that a "dugout"—a small wooden case commonly used to store marijuana—was protruding from an open "fanny pack" in Mr. Edwards' lap, Mr. Edwards said that there was about a gram of marijuana in it. He said that he used the marijuana for medicinal purposes related to his injuries.

Detective Braden testified that he then asked whether he could search Mr. Edwards' residence, and that Mr. Edwards orally gave him consent to do so. He testified that when he asked Mr. Edwards to sign a "consent to search" form, however, Mr. Edwards refused. When Detective Braden asked Mr. Edwards why he was refusing to sign the form, Mr. Edwards responded that he was "afraid of the federal forfeiture laws," and also blurted out that he had "five hundred plants of marijuana in [his] attic." Mr. Edwards also speculated aloud that his brother's ex-wife had called in the anonymous tip which implicated him in the marijuana-growing operation.

Detective Braden then informed Mr. Edwards that he intended to secure a warrant to search Mr. Edwards' residence. Detective Braden told Mr. Edwards that the latter had a choice: he could remain on the premises with a deputy present to ensure that no evidence was destroyed, or he could enter the house with an officer, retrieve any necessary personal effects, and go elsewhere while the officers executed the search warrant. Mr. Edwards chose to leave and go to his brother's house, and the officers, with his consent, accompanied him into his residence when he collected his personal effects from inside the house.

The police obtained and executed a warrant to search 19435 Fry Road. They were assisted by officers of the Platte County Sheriff's Department and by agents of the DEA Airport Task Force. Ultimately, the searchers found and seized numerous items of drug paraphernalia, $4,300.00 in United States currency, books and magazines devoted to the subject of growing marijuana, and more than 900 marijuana plants in various stages of maturity. The plants were grown and maintained using an elaborate hydroponic cultivation system, including halogen lights, timers, a carbon dioxide generator, and irrigation and nutrient systems.

Mr. Edwards was arrested and charged with attempted manufacture of a controlled substance, in violation of Section 195.211 RSMo Cum.Supp.1998. He moved to suppress the physical evidence seized from his home, including pictures taken by the seizing officers, on the ground that the police were not lawfully on his premises when they initially talked with him, saw the dugout, and obtained admissions from him that in part formed the basis of the affidavit used to secure the warrant to

search his home, and that any physical evidence seized as a result thereof was therefore excludable as "fruit of the poisonous tree."[1] The court below denied Mr. Edwards' motion to suppress, and the parties proceeded to try the case before Judge Hull on September 8, 1999. The court found him guilty and sentenced him to ten years imprisonment on October 28, 1999. This appeal follows.

## II. LEGAL ANALYSIS

### A. Standard of Review

"Our review of a trial court's ruling on a motion to suppress is limited to a determination of [the] sufficiency of the evidence to sustain the trial court's finding." *State v. Kriley,* 976 S.W.2d 16, 19 (Mo.App. W.D.1998). "We will affirm the judgment of the trial court if there is sufficient evidence which would support the trial court's decision to sustain the motion to suppress on any ground alleged in the respondent's motion." *Id.* "We will only reverse the trial court's judgment if it is clearly erroneous." *Id.* "The trial court's judgment is clearly erroneous if we are left with the definite and firm impression that a mistake has been made." *Id.*

### B. The Trial Court Did Not Err in Declining to Suppress Physical Evidence Seized From Mr. Edwards' Home

Mr. Edwards contends that it was error to deny his motion to suppress the physical evidence seized from his home, and that the admission of the seized evidence violated his rights under the Fourth Amendment to the United States Constitution, and Article 15, Section 1 of the Missouri Constitution. In support, Mr. Edwards correctly notes that the protections of the Fourth Amendment extend to the curtilage of a person's home, *State v. Adams,* 791 S.W.2d 873, 877 (Mo.App. W.D.1990); *State v. Schweitzer,* 879 S.W.2d 594, 596 (Mo.App. E.D.1994), and that the "curtilage" of a person's home is generally defined as the enclosed space of ground and buildings immediately surrounding a dwelling house. *Adams,* 791 S.W.2d at 877. Mr. Edwards argues that because the Platte County Sheriff's Department officers had neither a warrant nor consent to enter the driveway, front walkway, or porch of his home—which he argues are within the "curtilage" of his home[2]—the officers' entry was illegal, and all searches and seizures made as a proximate result of this entry should have been excluded as "fruits of the poisonous tree." We disagree.

While the Fourth Amendment's protections do extend to curtilage areas appurtenant to or associated with a dwelling, this does not mean that police cannot enter a curtilage area without a warrant. To the contrary, "it is altogether proper for police with legitimate business to enter the areas of curtilage open to the public." *Kriley,* 976 S.W.2d at 22. *Accord, State v. Akers,* 723 S.W.2d 9, 14 (Mo.App. W.D. 1986). Accordingly, in the course of a criminal investigation, a law enforcement officer, without a warrant, is permitted "to investigate a crime or to conduct official business at a residence in places where the

1. *See State v. Blair,* 691 S.W.2d 259, 263 (Mo. banc 1985), *citing Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

2. Whether or not an area surrounding a dwelling is within the dwelling's "curtilage" is generally assessed on a case-by-case basis, weighing four factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) steps taken to protect the area from observation by people passing by. *Schweitzer,* 879 S.W.2d at 596, *citing, United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1139–40, 94 L.Ed.2d 326 (1987). It is not necessary to employ this test in any detail here, however, since the question of whether driveways, front walks, or front porches are protected areas of a dwelling's "curtilage" has largely been settled in the courts of this state and many others. *See discussion infra.*

public is invited." *Kriley,* 976 S.W.2d at 22. We initially approved such warrantless investigative incursions by officers onto the curtilage of a dwelling in *Akers,* in which officers used "normal means of public access to the residence doors," and found evidence in plain view along those means of public access. *Akers,* 723 S.W.2d at 14–15. We reaffirmed this practice in *Kriley,* in which we observed that the rationale for allowing warrantless entry onto certain areas of the curtilage of a dwelling is "basically the same rationale given for removing from Fourth Amendment protection a plain view seizure—that there is no reasonable expectation of privacy subject to Fourth Amendment protection where the public at large is welcome." *Kriley,* 976 S.W.2d at 22.[3]

 Numerous courts have addressed whether these principles permit police entry onto the driveway, front walkway, or front porch of a home. As most of these cases note, the key issue in determining the legitimacy of police entry into a particular area is whether the occupant of the premises has somehow exhibited a reasonable expectation of privacy in that area. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). If an occupant permits visitors to enter onto portions of the property, such as the driveway or front walk, so as to reach the door, or if such areas are visible from outside the property, then the occupant is generally held not to have a reasonable expectation of privacy in those portions of the property. *See United States v. Ventling,* 678 F.2d 63, 66 (8th Cir.1982) ("Ventling's assertions of expectations of privacy with regard to the driveway and yard seem unreasonable under the circumstances here. We have in some instances found

such expectations reasonable with regard to property located out of public view on a defendant's land.... However, a driveway and portion of the yard immediately adjacent to the front door of the residence can hardly be considered out of public view"); *Bickar v. Gray,* 380 F.Supp. 804, 806 (N.D.Ohio 1974) ("There were no signs warning the agents to stay away from the petitioner's porch and it was open for the use of tradesmen; thus it cannot be said that the agents were not entitled to go to the door and knock"). As La Fave summarizes the general rule, "when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go *(e.g., walkways, driveways, porches),* observations from such vantage points are not covered by the Fourth Amendment." *See* 1 La Fave, *Search and Seizure,* Sec. 2.3(f) & nn. 196–98 (1996) (emphasis added) (citing dozens of cases from a wide variety of jurisdictions supporting this proposition).

 Of course, whether a particular driveway, walkway, front porch, or other area of the curtilage of the home should be deemed open to the public, and thus subject to warrantless entry by the police, must be determined on a case-by-case basis. If in a particular case an occupant has taken effective steps to protect areas of the property from view and from uninvited visitors, then a privacy interest may be found in that area sufficient to preclude police from coming onto it for investigative purposes without permission. *See, e.g., United States v. Magana,* 512 F.2d 1169, 1171 (9th Cir.1975) ("It would be ... unwise to hold, as a matter of law ... that no

---

**3.** In *Kriley,* this Court assessed the propriety, under the Fourth Amendment, of officers' warrantless entry into a doorless enclosed area attached to the rear of a residence. This structure was more or less an exterior hallway, which led to a door entering the dwelling house proper. This Court concluded that such a structure was to be afforded Fourth Amendment protection, first because it could

be deemed "curtilage" of the dwelling, as defined in *Adams* and *Schweitzer,* and second because it was not "curtilage" upon which members of the public would ordinarily be welcome; it was enclosed and located at the rear of the residence, which was consistent with a reasonable expectation of privacy therein.

driveway is ever protected [by the Fourth Amendment] from police incursions. The test in each case should be that of reasonableness, both of the possessor's expectations of privacy and of the officer's reasons for being on the driveway").

■ In the case at bar, the evidence fully supported the determination that the front driveway, front walk and front patio areas of Mr. Edwards' home were open to the public, and that Mr. Edwards did not have a reasonable expectation of privacy in them. At the suppression hearing, Detective Braden testified that the front door of Mr. Edward's house was visible from Fry Road, as were the driveway and front walkway. He also testified that there was not a "No Trespassing" sign on the property, or indeed, any other type of obstruction that would indicate that he or any other member of the public was not welcome or allowed onto the property. He presented photographs which confirmed these assertions. They show that the driveway, front walk and patio areas, while set back from the road, are clearly visible from it, and that no fences prevent visitors from walking up the driveway or walk and knocking on the front door, as the officers did in this case. It was while they were standing at the front door that Mr. Edwards appeared on the front patio and the police engaged him in conversation. Nothing in the record suggests that Mr. Edwards had a reasonable expectation of privacy in these areas at the front of his home, such that the police could not enter them for investigative purposes without a warrant. As the police were thus legitimately on the premises in an area reasonably regarded to be "open to the public," Mr. Edward's allegations that evidence seized as a proximate result of what the officers learned while talking to Mr. Edwards on the front patio are without merit, and his argument that such evidence must be excluded as "fruit of the poisonous tree" must be rejected.

For all of these reasons, the judgment of conviction is affirmed.

SMART, P.J., and ELLIS, J., concur.