**STATE of Missouri, Appellant,**

v.

**Conrad KRUSE, Jr., Respondent.**

**No. WD 70481.**

Missouri Court of Appeals,
Western District.

Jan. 19, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 2010.

Application for Transfer Denied
April 20, 2010.

Shaun J. Mackelprang and Jayne T. Woods, Asst. Attorney General, Jefferson City, MO, for appellant.

Laurie S. Ward, Sedalia, MO, for respondent.

Before LISA WHITE HARDWICK, P.J., JAMES M. SMART, JR., and ALOK AHUJA., JJ.

JAMES M. SMART, JR., Judge.

The State of Missouri appeals the grant of a motion to suppress physical evidence in a criminal case against Conrad Kruse. The State argues on appeal that the evidence should not have been suppressed. The judgment is affirmed.

## Facts

Conrad Kruse was charged with two counts of possession of a controlled substance, section 195.202, one count of first-degree trafficking, section 195.222, one count of unlawful use of drug paraphernalia, section 195.233, and one count of possession of a methamphetamine, section 195.233, and one count of possession of a methamphetamine precursor with intent to manufacture methamphetamine, section 195.246. Kruse filed a motion to suppress physical evidence resulting from the search of his home and storage shed. After a hearing, the motion was granted.

The following evidence, with the facts presented in the light most favorable to the trial court's ruling, was presented at the suppression hearing. On September 22, 2006, Officer Ron Finnell of the Mid–Missouri Drug Task Force, along with Officer Mark Morgan of the Pettis County Sheriff's Department, met with Deputy Ehlers of the Benton County Sheriff's Department. Deputy Ehlers informed the officers, based upon information he had received from a confidential informant, that an individual referred to as Jeremy Beel was involved in the theft of some anhydrous ammonia in Ionia, Missouri, and that Beel was planning to do a methamphetamine cook in Pettis County at a particular location. Officer Morgan had said that Deputy Ehlers's informants previously had provided accurate information. Ehlers provided a description of the van Beel would be driving, along with the license plate number. The van was registered in the name of Beel's father.

Officers Finnell and Morgan, in running a background check on Beel, discovered that he had an outstanding warrant. The warrant had "caution indicators," which meant that Beel was considered violent. The two officers then went to the location suggested in the tip to try to locate Beel's van. Upon arrival, they observed no evidence that Beel or anyone else was present.

The officers drove around, trying to "brainstorm" other locations where Beel might be. The officers believed that Beel would be unloading the anhydrous ammonia quickly, so they were looking in places known to be involved with methamphetamine. Officer Finnell suggested looking at the residence of Conrad Kruse who had previously violated the "nine[–]gram Sudafed law." Officers Finnell and Morgan had no information connecting Beel with Kruse.

When the officers arrived at Kruse's residence around 12:21 a.m., they observed the van registered to Beel's father. The van had a flat tire. There were several other cars on the driveway also. Kruse's property contained a mobile home that Kruse was using as his residence, a storage shed, and an abandoned trailer. There were "No Trespassing" signs posted near the front door of the residence and on the front door of the shed. The property was bordered by a wooded area on three sides and by Richardson Road on the fourth side. There were no obstructions to block access to the backyard. The storage shed was located at the end of the drive-

way, approximately thirty to forty yards from the road. The officers observed a light on in the shed. They had seen the light on at night before. The shed door was not visible from the road. The residence, a mobile home, had a back door, but it is not clear whether the officers knew at that time that the mobile home had a back door.

After verifying the license plate number of the van, the officers met up with two uniformed deputies a short distance away from Kruse's residence. The officers decided not to apply for a search warrant. They formulated a plan whereby two uniformed deputies would approach the front door of the residence to make contact with the residents in an attempt to locate Beel. Officers Finnell and Morgan would go to the back of the residence to cover any rear door and the shed to prevent Beel from running away.

The officers split up. The two uniformed officers proceeded to the front door, and Officers Finnell and Morgan headed toward the back yard according to plan. At this point, none of the officers had requested or received consent to enter the property. As Officers Finnell and Morgan passed between the shed and the residence, and before the uniformed officers had a chance to knock on the front door, the shed door came "flying open," and Kruse "came bolting out the door." Officer Morgan ordered Kruse to the ground. When Kruse had come out of the shed, he left the door wide open. Officer Morgan observed another man and two women inside the shed. He also observed "various plastic jars and glasses with liquids in them, some of them had bi-phase liquids," and there was a hot plate. Officer Finnell moved toward the shed to cover the open door, and he also observed a man and two women inside the shed. The man identified himself as Beel. Officer Finnell ordered everyone out of the shed, and the three individuals complied.

Officer Finnell briefly glanced in the shed to verify that there were no other individuals present. While doing so, he noticed a "very elaborate system basically for manufacturing methamphetamine." After everyone was secured, the officers took pictures from the threshold of the shed to document what they were able to see. They did not move anything in the shed, but they were able to smell chemical odors associated with the manufacture of methamphetamine.

At some point, Kruse's wife came out the back door of the residence, wanting to know what was going on. She, along with the others, was arrested on a twenty-four hour hold for the manufacture of methamphetamine. One of the uniformed deputies accompanied Kruse's wife back into the residence to obtain her cell phone, and while doing so, he observed a set of triple beam balance scales sitting "in plain sight" in the kitchen. Officer Finnell left to secure a search warrant for the property. After he returned with a warrant, the officers located and seized a variety of evidence associated with the manufacture of methamphetamine from both the shed and the residence.

Kruse filed a motion to suppress all of the evidence obtained from the search on the ground that the search violated his Fourth Amendment rights. Among other arguments, Kruse alleged that "[t]he seizure of Defendant Kruse and items on or about his person were fruit of a previous illegal and unconstitutional search of his property." Officers Morgan and Finnell testified at the suppression hearing. Following the receipt of trial briefs and a suppression hearing, the trial court granted Kruse's motion to suppress the evidence. The court found that the officers conducted a warrantless search of Kruse's

backyard without the existence of exigent circumstances.

The State appeals.

## Standard of Review

"Where a trial court has granted defendant's motion to suppress, 'we review the trial court's decision on appeal under an abuse of discretion standard ... [and] the decision will be affirmed unless it is clearly erroneous.'" *State v. McDonald,* 170 S.W.3d 535, 537 (Mo.App.2005) (citation omitted). "Our review ... is limited to a determination of sufficiency of the evidence to sustain the trial court's finding." *State v. Kriley,* 976 S.W.2d 16, 19 (Mo. App.1998). "We will defer to the trial court's findings of fact, but make an independent evaluation of the conclusions of law the trial court draws from its factual findings." *Id.* "Where there is no dispute as to the underlying facts, the determination of the reasonableness of a search and seizure, under the Fourth Amendment, is a question of law." *Id.* "We will view the evidence in the light most favorable to the decision of the trial court even though we may have weighed the evidence differently." *Id.* "When there is conflicting evidence, we will defer to the trial court's determination regarding the credibility of the witnesses, accepting or rejecting all, part, or none of the testimony it hears." *Id.* "If the trial court's ruling is plausible in light of the record viewed in its entirety, [the] court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.*

## Analysis

The State argues that the evidence recovered from Kruse's mobile home and shed should not have been suppressed. It claims that the officers did not conduct a warrantless search. The State says that the arrests were based on probable cause stemming from the officers' plain view of a methamphetamine lab on Kruse's property. It also states that the evidence Kruse sought to suppress was seized pursuant to a valid search warrant.

◼◼ "The Fourth Amendment prohibition against unreasonable searches and seizures inherently acknowledges the sanctity of a person's home and extends protection to the curtilage of the home." *State v. Berry,* 92 S.W.3d 823, 829 (Mo.App.2003). "The curtilage includes all out-buildings used in connection with the residence, such as garages, sheds, barns, yards, and lots connected with or in the close vicinity of the residence." *Id.* "A search or seizure that occurs on a person's premises without a warrant is presumptively unreasonable." *State v. Cromer,* 186 S.W.3d 333, 343 (Mo. App.2005).

In essence, the State argues that the officers were not conducting a search and, instead, had a separate legitimate reason for being on Kruse's property (namely, to execute an arrest warrant and prevent the potential escape of Beel). Thus, argues the State, their entry was reasonable and did not violate Kruse's Fourth Amendment rights. Following this entry, the officers viewed a working methamphetamine lab in plain view, which provided them with probable cause to arrest the individuals present and to obtain a search warrant for the property. Because no evidence was seized and no search was conducted until a search warrant was procured, the State argues that there was no violation of the Fourth Amendment.

The trial court found that the officers entered onto Kruse's private curtilage, without a warrant, to execute an arrest warrant on a non-resident third party. Kruse had a reasonable expectation of privacy in his backyard. The officers had no warrant and lacked consent to enter

Kruse's property to search for Beel. The court found no reason to believe that Beel, if present, constituted a present threat to anyone at Kruse's residence. The trial court believed that exigent circumstances did not exist to bypass the warrant requirement.

 Under the Fourth Amendment, law enforcement officers may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant only when there is consent or when "exigent circumstances" exist. *Steagald v. United States,* 451 U.S. 204, 205–06, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (search of residence looking for the non-resident subject of an arrest warrant held a violation where no exigent circumstances). Exigent circumstances "include pursuing a fleeing felon, preventing the imminent destruction of evidence, preventing a suspect's escape, or mitigating the risk of danger to law enforcement or other persons inside or outside of the dwelling." *Cromer,* 186 S.W.3d at 344. "There is no absolute test for exigent circumstances; the determination that exigent circumstances are present is made on a case-by-case basis." *Id.* "In assessing circumstances to determine if they were exigent, the circumstances are evaluated on the basis of how they would have appeared to prudent, cautious and trained officers." *Id.* "The justification for the exigency exception is time related, i.e., there is a need that will not brook the delay incident to obtaining a warrant." *Id.* Several factors are considered when determining whether exigent circumstances exist. These factors include:

(1) a grave offense is involved, particularly a violent crime; (2) the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe the suspect committed the offense; (4) strong reason to believe the suspect is in the premises to be entered; (5) a likelihood the suspect will escape if not swiftly apprehended; (6) the entry, though not consented, is made peaceably.

*Id.*

 "The plain view doctrine provides that anything an individual knowingly exposes to public view, even in his or her own home, involves no reasonable expectation of privacy and is not a subject of Fourth Amendment protection." *Kriley,* 976 S.W.2d at 19.

 "[I]t is altogether proper for police with legitimate business to enter the areas of curtilage open to the public." *State v. Edwards,* 36 S.W.3d 22, 26 (Mo. App.2000). "Accordingly, in the course of a criminal investigation, a law enforcement officer, without a warrant, is permitted 'to investigate a crime or to conduct official business at a residence in places where the public is invited.'" *Id.* at 26–27 (citation omitted). "[T]he key issue in determining the legitimacy of police entry into a particular area is whether the occupant of the premises has somehow exhibited a reasonable expectation of privacy in that area." *Id.* at 27. "'[W]hen the police come on private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (*e.g., walkways, driveways, porches*), observations from such vantage points are not restricted by the Fourth Amendment.'" *Id.* (*quoting* 1 LaFave, *Search and Seizure,* § 2.3(f) & nn. 196–98 (1996)). "If in a particular case an occupant has taken effective steps to protect areas of the property from view and from uninvited visitors, then a privacy interest may be found in that area sufficient to preclude police from coming onto it for investigative purposes without permission." *Id.*

In *Kriley*, the police went to a home to speak with its residents about the contents of a trash bag found on the side of the road (the trash bag contained drug paraphernalia and a bill with the residence's address on it). 976 S.W.2d at 17–18. "Due to a large canine chained near the front entry of the residence," police officers "went to the rear of the residence, looking for an alternate entry." *Id.* at 18. "Once at the rear, they found a structure attached to the residence which enclosed an inner door which continued into the residence." *Id.* "Rather than knocking on the entry to the structure, [the officers] entered the structure, uninvited and without any exigent circumstances, and knocked on the inner door located inside." *Id.* As one officer was knocking, the other officer observed a clear glass mason jar containing a white powdery substance that smelled like methamphetamine. *Id.* A field test gave a positive indication the substance was methamphetamine. *Id.* Based on the apparent presence of methamphetamine, the officers obtained a search warrant. *Id.* A subsequent search revealed that the residence was an operating methamphetamine laboratory. *Id.* The trial court granted a motion to suppress the evidence seized from the search of the home. *Id.* at 19.

The court then considered "whether the structure attached to the residence was open to the public." *Id.* at 22. "In looking at all the factors, in a close case, we conclude that the occupants of the residence in question closed off the area consistent with a reasonable expectation of privacy therein." *Id.* The court affirmed suppression of the evidence. *Id.*

Here, the State relied on *United States v. Raines*, 243 F.3d 419 (8th Cir.2001), in arguing that the officers had the right to be in Kruse's back yard at the time in question. In *Raines*, a deputy sheriff went to the defendant's home attempting to serve civil process on another person believed to be present. *Id.* at 420. "After receiving no response at the front door but seeing several cars parked in the driveway, [the deputy] followed ... procedure and proceeded to the back of the home believing the inhabitants might be outside on a summer evening and unable to hear him knocking at the front door." *Id.* The officer "walked through a ten-foot wide opening in a wall of debris that acted as a make-shift fence around the perimeter of the property." *Id.* There he observed a large number of marijuana plants growing. *Id.* The officer left and obtained a search warrant. *Id.* at 420–21. The trial court subsequently denied the defendant's motion to suppress evidence seized pursuant to the warrant. *Id.* at 421.

The defendant in that case argued that the deputy's "observation of marijuana plants growing in plain view while standing within the curtilage of his home constitute[d] a warrantless search in violation of the Fourth Amendment." *Id.* The United States Court of Appeals disagreed, finding that there was a ten-foot wide gap in the "fence of debris," that there were no "no trespassing" signs posted, and that the deputy's "limited intrusion was justified because he had the legitimate objective of locating [the person in question], who he had reason to believe was located at the residence, and serving her with civil process." *Id.* It noted that courts have "previously recognized that law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence." *Id.* The court found that the marijuana plants were in plain view and the officer was lawfully in the backyard. *Id.* at 421–22.

*Raines* differs from this case in certain respects. In *Raines*, the officer was merely serving civil process. It was his job to

try to contact and serve the individual in question. There were no obvious assertions of a privacy interest in the property, and the "wall of debris" had a ten foot opening. Here, although the officers were purporting only to execute a warrant for Beel's arrest, the exigency to search Kruse's property in order to execute the arrest at 12:21 in the morning was not apparent.

In *Raines*, there were no exigent circumstances, but also there was no intent by the deputy sheriff to investigate the possibility of a crime in progress. Here, the officers would have believed that there might be criminal activity taking place, but there were no exigent circumstances and no search warrant. There was no apparent "need that will not brook the delay incident to obtaining a warrant." *Cromer*, 186 S.W.3d at 344.

It must also be noted that in *Kriley* and *Raines* the trial court reached different results in whether to suppress the evidence, but in each case the trial court ruling was affirmed. In close cases, some deference will be allowed the trial court in evaluating credibility and drawing inference. *See Kriley*, 976 S.W.2d at 19.

In this case, the police officers had substantial reason to believe that Beel was present. Though it was 12:21 a.m., they may have been permitted to knock on the front door and inquire whether Beel was present. Beel had an outstanding warrant that contained caution indicators notifying the officers that Beel was considered to be potentially violent. For the safety of the officers knocking on the door, the police presumably could have strategically positioned other officers in the front yard to provide protection. Alternatively, the offi-

cers could have knocked on the front door in the daylight, which would have been both safer and more likely to preclude escape by Beel. More significantly, the officers could have presented to a magistrate a persuasive request for a warrant to enter on the premises to search for Beel at any time of day or night.[1] The officers then, with the search warrant, could have "covered" the back yard while knocking on the front door.

The State argues that Kruse did not have an expectation of privacy in his backyard. The State notes that there were no gates or objects to hinder entrance into the backyard. Nothing obstructed a person's view into the back yard except the buildings. There appears to be a well-travelled route from the driveway to the rear of the property, marked by large pieces of wood resembling railroad ties. The two "no trespassing" signs were posted on doors, which the State says implies that access was denied to the *interior* of the residence or shed without permission.

We cannot agree that there was no expectation of privacy in the backyard. The officers arrived at the Kruse residence after midnight. No exterior lights were on to welcome the public to come on the premises. The entrance to the residence is in the front yard. The "no trespassing" signs would ordinarily be understood to assert a privacy interest on the entire property. The back yard could not be seen from the road and was not in plain view. The back yard and backdoor were enclosed by trees on three sides and the home on the fourth side. In *Raines*, even though the back yard had a wall of debris serving as a make-shift fence, the intrusion was argu-

---

1. The information they had, apparently from a reliable informant, was that Beel had stolen anhydrous ammonia. Kruse had a prior conviction for violating the law regulating the purchase of Sudafed. The van connected to Beel was in the driveway. There was a shed on the property.

ably less than in this case because it was daylight and the deputy sheriff was merely seeking to serve process. The trial court could have regarded the intrusion as reasonable under those circumstances.

This is not a case where the police officers merely knocked on the front door to ask whether Beel was present. The officers went into the back yard before trying the front door. The officers did not fear present danger or present destruction of evidence. When the·officers arrived at Kruse's residence, they called for and took the time to wait for additional officers to arrive. Beel's van had a flat tire. Beel was presumably unaware of police presence, and his van was essentially immobile. Prior to the police entry into the back yard, Beel had no motive to flee or destroy evidence. The police acknowledged that the situation did not call for immediate action. The officers had time to seek a warrant to search for Beel. In the unlikely case the warrant were denied, the officers still could have come back and knocked on the front door to ask about Beel.

The trial court found that there was no exigency. We cannot say that the trial court's judgment is clearly erroneous. *State v. Edwards*, 36 S.W.3d 22, 26 (Mo. App.2000). We do differ with the trial court in that we would interpret the facts as pointing sufficiently to the presence of Beel on the premises as to support the issuance of a search warrant to find Beel. However, our difference with the trial court in that regard does not mean the court's ruling was "clearly erroneous." The police may have had probable cause to believe Beel most likely was present, but they did not have probable cause to believe a crime was in progress. In any event, "exigent circumstances" that do not otherwise exist cannot be provoked by officers violating privacy interests protected by the Fourth Amendment. *See, e.g., State v.*

*Berry,* 92 S.W.3d 823 (Mo.App.2003) (concluding that the fenced area behind the defendants' residence was curtilage to the residence, and police officers should not have entered the area without a search warrant). While under *Steagald,* 451 U.S. at 215–16, 101 S.Ct. 1642, it is clear that officers may search for the subject of an arrest warrant in the home of a third party without a search warrant *if exigent circumstances exist,* here we cannot say that the trial court was required to regard these circumstances as exigent.

The State argues that this is not the kind of case that the exclusionary rule was meant to redress. The State argues that any possible violation of Kruse's Fourth Amendment rights was inadvertent because police officers did not intend to conduct a search. By entering into the back yard, the police were entering onto property as to which there was a privacy interest protected by the Fourth Amendment. Further, the intention of the officers was a factual inference drawn by the trial court based on observing the testimony.

## Conclusion

Our review is only for an abuse of discretion; the decision will be affirmed unless it is "clearly erroneous." *McDonald,* 170 S.W.3d at 537. There is sufficient evidence from which the trial court could make factual findings to support the conclusion reached. *See Kriley,* 976 S.W.2d at 19. The trial court observed all the witnesses and drew inferences from the testimony. We cannot say the trial court ruling was "clearly erroneous."

The judgment is affirmed.

All concur.