STATE of Missouri, Respondent,

v.

**Fred E. CROMER, Appellant.**

**No. WD 64674.**

Missouri Court of Appeals, Western District.

Dec. 27, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 31, 2006.

Application for Transfer Denied April 11, 2006.

---

Irene C. Karns, Columbia, MO, for appellant.

Shaun J. Mackelprang, Jefferson City, MO, for respondent.

Before RONALD R. HOLLIGER, P.J., ROBERT G. ULRICH and JOSEPH M. ELLIS, JJ.

ROBERT G. ULRICH, Judge.

Fred E. Cromer appeals his convictions of two counts of possessing chemicals with the intent to manufacture methamphetamine, section 195.420,[1] two counts of possession of drug paraphernalia with the intent to manufacture methamphetamine, section 195.233, one count of possession of pseudoephedrine, section 195.246, RSMo Cum Supp.2001, and one count of manufacturing a controlled substance, methamphetamine, section 195.211. Mr. Cromer's sole point on appeal is that the trial court erred in overruling his motion to suppress

---

1. All statutory references are to **RSMo 2000** unless otherwise noted.

and admitting over his objection evidence of items seized from his garage. Mr. Cromer claims the police arrested him in his home without consent or the presence of exigent circumstances and that the subsequent consent to search was not voluntary as it was the product of his unlawful seizure, all in violation of the Fourth Amendment, the Fourteenth Amendment, and Article I, Section 15 of the Missouri Constitution. Mr. Cromer's point is partially granted, and the judgment of convictions is reversed and remanded for a new trial.

### Facts

On December 7, 2001, Lt. Howard Judd of the Buchanan County Drug Strike Force received a tip from a confidential informant that Christopher Allen Barker was involved with a man named Fred in the making of methamphetamine. The informant told Lt. Judd that he had been to an address in St. Joseph, Buchanan County, Missouri, within the past couple days and had observed what he or she believed to be a methamphetamine lab and the finished product of methamphetamine. The informant further told Lt. Judd that Fred lived with a woman named Donna, but did not know Fred or Donna's last name. Finally, the informant gave Lt. Judd a description of the vehicles driven by Donna, Fred, and Mr. Barker and gave Lt. Judd and Lt. Shawn Collie, another Strike Force member, directions regarding how to get to the address where the lab was located. From this description, Lt. Judd and Lt. Collie determined that the residence was located on Riverview Drive in St. Joseph, Missouri.

After receiving this tip, Lt. Judd and Lt. Collie discussed the information with the rest of the Strike Force. Sgt. Tiger Parsons, another Strike Force member, informed the other officers that he knew Fred and Donna. He identified them as Fred E. Cromer and Donna L. Todd. Upon further checking, the Strike Force learned that Mr. Barker was currently on parole for possession of methamphetamine. The officers spoke with Mr. Barker's parole officer, who stated that Mr. Barker gave his current address as 722 Riverview in St. Joseph. A CAD check revealed that Fred E. Cromer and Donna L. Todd were also residents of 722 Riverview in St. Joseph. Sgt. Parsons further informed the Strike Force that he had information from the past that Mr. Cromer and Ms. Todd were methamphetamine users and that Mr. Cromer was a methamphetamine cook. Sgt. Parsons told the other officers that, based on his past dealings with Ms. Todd, he believed that if he approached her she would allow the officers to search the residence.

At approximately 10:30 that night, Sgt. Parsons, Lt. Collie, Lt. Judd, and Investigator Tammy Mann[2] drove to the neighborhood, parked the Strike Force vehicles a block or two away from the residence located at 722 Riverview Drive, and walked to the residence. They planned to do a "knock and talk," i.e., knock on the front door of the residence and ask for authorization to enter and search the residence. They were dressed in civilian clothes. Sgt. Parsons and Lt. Collie knocked on the residence's front door. Lt. Judd and Investigator Mann went into the backyard in case the occupants attempted to flee; the officers believed that Mr. Barker had a history of running from the police.

---

2. Investigator Tammy Mann later married Sgt. Parsons and testified as Investigator Parsons at trial.

Holly Todd, Mr. Cromer, and Ms. Todd's twelve-year-old daughter answered the door. Sgt. Parsons asked Holly if her parents were home; she told him that her mother was at work and her father was working on a car in Savannah, Missouri. Sgt. Parsons asked Holly if they could come inside and she allowed them to enter the home. Once inside, he obtained Ms. Todd's work phone number from Holly. The officers called Jesse Todd, Holly's fourteen-year-old brother, into the living room. Without consent, they quickly walked through the rest of the house to determine whether other people or hazardous chemicals were present, and, finding none, then waited in the living room. Mr. Cromer has not argued that this search violated his rights. Lt. Judd and Investigator Mann were informed by radio that the other two officers were inside; they then entered the house through the back door.

Sgt. Parsons called Ms. Todd at work and told her that the police were at her house due to a citizen's report and were concerned about a situation there. He asked that she come home immediately. Ms. Todd told him that she would seek permission from her boss to go home, and she would call him back. Ms. Todd called and informed Sgt. Parsons that she could leave work in about twenty minutes. Sgt. Parsons asked for permission to search the house, and Ms. Todd replied that the officers could search the house but not until she arrived at the home. Ms. Todd told the officers they could wait inside the residence until she arrived.

Lt. Judd left the living room and entered Ms. Todd's bedroom, which was at a corner of the house, where he could observe events occurring at the front of the house. He saw a car back into the driveway and notified the other officers of this event with his radio. Mr. Cromer and Mr. Barker were in the vehicle, although the officers only knew two men were in the car and did not yet know their identities. Mr. Cromer and Mr. Barker sat in the car for fifteen to twenty minutes; they then took items from the trunk of the car and carried them toward the garage attached to the house. Lt. Judd observed that the items were a white five-gallon bucket and a couple of bags. He could not see what was in the bucket or the bags.

Lt. Judd advised the other officers when the two men had exited the car. Lt. Collie and Sgt. Parsons left the living room and went into Jesse's room, which led to the garage through a connecting door. The officers heard the overhead garage door open and then close behind Mr. Cromer and Mr. Barker. Upon hearing the garage door close, Lt. Collie and Sgt. Parsons opened the connecting door and stepped into the garage. Both Lt. Collie and Sgt. Parsons testified that they did not know the identities of the two men in the garage at that time. Neither Lt. Collie nor Sgt. Parsons could identify Mr. Barker, and only Sgt. Parsons could identify Mr. Cromer. Sgt. Parsons did not see Mr. Cromer to identify him until both he and Lt. Collie were in the garage with Mr. Cromer and Mr. Barker.

Mr. Barker had several backpacks in his hands, and Mr. Cromer was carrying two five-gallon plastic buckets. The officers testified that they were concerned about their safety as they could not see Mr. Cromer and Mr. Barker's hands, they understood Mr. Barker to have a history of violence including weapons possession, and the officers believed the men might be holding hazardous chemicals related to methamphetamine production. The officers ordered the two men to put their hands on their heads and then patted both men down for weapons. Lt. Collie observed plastic bottles containing a clear liquid on a bed of dry ice in one of the buckets Mr.

Cromer had been carrying and knew this to be a step in the manufacture of methamphetamine. Lt. Judd entered the garage and also observed the buckets. The garage smelled of ether and anhydrous ammonia, both of which the officers knew are used in the production of methamphetamine.

Mr. Cromer and Mr. Barker were then arrested. After visually inspecting the chemicals in the bucket to ensure that they were stable, the officers left things where they were on the garage floor; they did not look in the backpacks. The officers determined to wait until they had proper equipment before going near the potentially hazardous chemicals. Lt. Judd took Mr. Cromer to Ms. Todd's bedroom, and Sgt. Parsons took Mr. Barker into the living room in order to question them separately. Lt. Judd attempted to obtain Mr. Cromer's consent to a search, but he refused at that time, stating that it was not his residence. When Mr. Cromer was informed that his Probation and Parole officer had stated Mr. Cromer's address was 722 Riverview Drive, Mr. Cromer responded that it was his ex-wife's house and admitted that he stayed there. Mr. Cromer denied knowing what was in the buckets and stated that he was just carrying them for Mr. Barker.

Ms. Todd arrived home thirty minutes to an hour after Mr. Cromer and Mr. Barker were taken from the garage. Ms. Todd did not consent to a search of the residence when she first arrived home. She was concerned about Mr. Cromer, whom she considered upset and confused. She asked and was permitted to go into the bedroom where Lt. Judd was questioning him. Sgt. Parsons joined them there a few minutes later, and Ms. Todd consented to a search of the home. Shortly thereafter, Mr. Cromer consented to a search.

During the search, neither Ms. Todd nor Mr. Cromer revoked their consent.

Lt. Collie retrieved protective gear from one of the Strike Force vehicles, and he and Lt. Judd returned to the garage after Ms. Todd consented to a search. Lt. Judd and Investigator Mann cataloged the evidence as it was found. Inside the bag Mr. Barker had carried into the garage, the officers found methamphetamine in chunky form. The bucket carried in by Mr. Cromer contained dry ice, muriatic acid, and methamphetamine not yet distilled from liquid form. The inventory also listed "trash"—the remnants of manufacturing methamphetamine, "bubblers"—small pop bottles that had been used with a mixture of acid and salt, empty cans of starting fluid, starting fluid, ephedrine, a coffee grinder with white residue, acetone, face masks, gloves, coffee filters, an electric skillet, a portable scale, glass baking dishes, lithium batteries, and camp stove fuel. Lt. Collie and Sgt. Parson's searched the house but found nothing of evidentiary value. All of the items inventoried and later admitted into evidence came from the garage.

After he was charged, Mr. Cromer filed a motion to suppress the evidence seized during the search. Following a suppression hearing, the court denied the motion. Samples were extruded from various exhibits and were submitted to the Missouri Highway Patrol for analysis. The Patrol chemist testified at trial that tests performed on three exhibits showed a mixture of methamphetamine and pseudoephedrine totaling 302 grams. Another exhibit contained 22 grams of methamphetamine. Mr. Cromer waived his right to a jury trial, the case proceeded to conclusion, and the court found him guilty. He was sentenced to fourteen years imprisonment for the manufacture of a controlled substance and five sentences of four years imprison-

ment for the other offenses pertaining to the incident. The four year terms are concurrent but are consecutive to the fourteen year sentence, for a total sentence of eighteen years imprisonment. This appeal followed.

## Standard of Review

Review of a "trial court's decision to deny a motion to suppress is limited to a determination of whether there is substantial evidence to support the decision." *State v. Mahsman,* 157 S.W.3d 245, 248 (Mo.App. E.D.2004). The facts and any reasonable inferences drawn from the facts are viewed in the light most favorable to the trial court's decision and any evidence or inferences to the contrary are disregarded. *Id.* Deference is given to the trial court's factual findings and credibility determinations. *State v. Newberry,* 157 S.W.3d 387, 397 (Mo.App. S.D.2005). The ruling will be reversed only if it is clearly erroneous. *Mahsman,* 157 S.W.3d at 249. The trial court ruling is clearly erroneous if this court is left "with a definite and firm belief a mistake has been made." *State v. Rowland,* 73 S.W.3d 818, 821 (Mo.App. S.D.2002). Nevertheless, whether the trial court properly applied Fourth Amendment precepts must be considered. *Mahsman,* 157 S.W.3d at 249. Testimony from both the suppression hearing and the actual trial is considered because the defendant timely moved to suppress the evidence and then timely objected to its admission at trial. *State v. Simmons,* 158 S.W.3d 901, 906 n. 2 (Mo.App. S.D.2005). When "there is little or no dispute about the facts, the question of whether the Fourth Amendment has been violated is a question of law and is therefore reviewed *de novo.*" *Id.* at 907.

## Parties' Arguments

In his sole point on appeal, Mr. Cromer claims that the seizure of his person inside his garage violated his Fourth Amendment rights because the police had neither a warrant for his arrest nor a search warrant and no exceptions to the warrant requirement existed when police officers entered the garage. Both Mr. Cromer and the State agree that if the police officers were in the garage lawfully, they could have legally seized Mr. Cromer under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), because the contraband in the buckets was in his possession, was in plain view, and constituted an exception to the warrant requirement. Under the plain view exception to the warrant requirement, once officers are lawfully in a place, any evidence that is readily observable and immediately recognizable as evidence of a crime may be seized without a warrant. *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564, (1971); *State v. Bibb,* 922 S.W.2d 798, 802 (Mo.App. E.D. 1996). Thus, the only disputed issue is whether the officers were inside the garage lawfully. Mr. Cromer asserts that, although the officers may have been inside the living room lawfully, they needed a warrant or an exception to the warrant requirement to enter the garage.

The State claims that the exigent circumstance exception to the warrant requirement applies. It argues that taking the time to obtain a warrant would have endangered the lives of the four officers and two children waiting inside the living room. This danger, according to the State, stems from Mr. Barker's history of violence and the dangerous nature of chemicals used in the production of methamphetamine. Thus, the State claims exigent circumstances allowed the warrantless entry into the garage and, once there, evidence of criminal conduct was in plain view. Further, the State argues that the rest of the evidence found in the garage

was located only after Ms. Todd consented to a search, and Ms. Todd's consent to search the house was freely and voluntarily given.

## Entry into the Home

■■■ Lt. Collie testified that the officers went to Ms. Todd's residence to do a "knock and talk." He explained at trial that a "knock and talk" is employed when law enforcement officers receive information relating to illegal drug activity that they believe has merit but is insufficient to obtain a warrant; they go to the residence, knock on the door, talk to whomever answers the door, try to identify who is there, and try to obtain consent to search the residence. Prior cases have examined and approved the police technique called "knock and talk." *State v. Kriley*, 976 S.W.2d 16, 22 (Mo.App. W.D.1998). Law enforcement officers are legally permitted to knock on the door of a private residence and seek consent to enter and search without probable cause or a warrant. *Id.* A suspect's consent to law enforcement's entry into his or her home to permit officers to search or make an arrest without a warrant does not violate the law. *State v. Rank*, 849 S.W.2d 230, 232 (Mo.App. W.D.1993)(citing *State v. Peters*, 695 S.W.2d 140, 144 (Mo.App. W.D.1985)).

When the officers knocked at the front door of the residence the informant had mentioned, Holly Todd, twelve-year-old daughter of Ms. Todd and Mr. Cromer, answered the door, informed them that her parents were absent, and consented to the officers' entry. All of the officers testified that they were aware that Holly and Jesse were minors. Although no bright line rule exists regarding whether a minor may consent to a search of his or her parent's home, in this case Holly Todd consented only to the police officers' entry into the home. *See Abdella v. O'Toole*, 343

F.Supp.2d 129, 135–38 (D.Conn.2004)(**noting the ongoing discussion in the courts regarding whether a minor may consent to a search of parent's home**); *Holman v. State*, 816 N.E.2d 78, 81–82 (Ind.Ct.App.2004)(**discussing various state approaches to allowing minors to consent to searches of parent's home**). A minor can consent to entry of the police into the common areas of the shared home. See *State v. Tomlinson*, 247 Wis.2d 682, 635 N.W.2d 201, 208–09 (Ct.App.2001); *State v. Tomlinson*, 254 Wis.2d 502, 648 N.W.2d 367, 376–77 (2002)(**noting the various states that allow minors to consent to entry**); *U.S. v. Gutierrez–Hermosillo*, 142 F.3d 1225, 1230–31 (10th Cir.1998)(**discussing the federal approaches to allowing minors to consent to police entry**). Thus, the officers' entry into the home upon Holly Todd's consent to enter was permissible.

■■■ After Ms. Todd received permission from her employer to go home, she informed the police officers that she would arrive home in about twenty minutes. Ms. Todd told Sgt. Parsons that the officers could wait inside the residence until she arrived. She stated that she would consent to the requested search but only when she was present. If consent is given, law enforcement must remain within the "scope of the consent." *State v. Garcia*, 930 S.W.2d 469, 472 (Mo.App. S.D.1996). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness, *i.e.*, what the typical person would have understood by the exchange between the officer and the suspect." *State v. Hofmann*, 895 S.W.2d 108, 114 (Mo.App. W.D.1995). When Sgt. Parsons concluded his phone conversation with Ms. Todd, the scope of Ms. Todd's consent was limited to the officers waiting for her arrival, and it did not include searching the

home or entering any room except that where the officers were received when they entered the house. Yet, Lt. Judd went into her bedroom to permit his observation of anyone approaching the front of the house. He did not have permission to enter Ms. Todd's bedroom.

### Seizure of Mr. Cromer in the Garage

 Lt. Collie testified that Lt. Judd conducted surveillance by watching from Ms. Todd's bedroom window to protect and maintain officer safety. He testified that the officers did not want to be startled or startle anyone who happened to enter the residence. When the car with Mr. Cromer and Mr. Barker backed into the driveway, Lt. Judd notified the other officers. Lt. Judd watched the two men sit in the car for fifteen to twenty minutes, then get out of the car and take some items from the trunk. Lt. Judd informed the other officers when the two men began walking toward the garage with the items. At that time, according to Sgt. Parson's testimony, he and Lt. Collie proceeded to the door that connected Jesse's room with the garage, which was closed. The two police officers opened the door and waited. They could not see inside the garage when standing in the open doorway, but they could hear events occurring in the garage after the overhead garage door was opened and the two men entered the garage. Lt. Collie testified that he and Sgt. Parsons waited until after the two men had entered the garage and closed the overhead garage door before they entered the garage because they wanted to be in close proximity to the two men when they confronted them. Upon entering the garage, the officers observed what Mr. Cromer and Mr. Barker were carrying, recognized it as contraband, and arrested the men.

 The Fourth and Fourteenth Amendments of the U.S. Constitution and Article 1, Section 15 of the Missouri Constitution guarantee the right of citizens to be free from unreasonable searches and seizures. *Simmons*, 158 S.W.3d at 906 (citing *State v. Rutter*, 93 S.W.3d 714, 723 (Mo. banc 2002)). The Fourth Amendment is applicable to the states through the Fourteenth Amendment due process clause. *State v. Werner*, 9 S.W.3d 590, 599 (Mo. banc 2000). Missouri's prohibition against unreasonable searches and seizures is coextensive with the protection provided by the Fourth Amendment. *Ashworth v. City of Moberly*, 53 S.W.3d 564, 579 (Mo.App. W.D.2001). The purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Id.* (quoting *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935 (1967)). Arresting a person in his or her home without a warrant, even if the law enforcement officer has probable cause, is impermissible under the Fourth Amendment unless proper consent is granted to enter the home or exigent circumstances exist. *State v. Adams*, 791 S.W.2d 873, 877 (Mo.App. W.D.1990); *State v. Murray*, 744 S.W.2d 762, 771 (Mo. banc 1988), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988).

### Exigent Circumstances

 The State asserts that exigent circumstances existed justifying the officers' entry into the garage and Mr. Cromer's subsequent arrest. A search or seizure that occurs on a person's premises without a warrant is presumptively unreasonable. *Simmons*, 158 S.W.3d at 906. The state can overcome this presumption by demonstrating that the search or seizure "falls within one of a carefully defined set of exceptions, many of which are based

on the presence of exigent circumstances." *Id.* These exigent circumstance exceptions include pursuing a fleeing felon, preventing the imminent destruction of evidence, preventing a suspect's escape, or mitigating the risk of danger to law enforcement or other persons inside or outside of the dwelling. *Id.* If exigent circumstances justified entry into the garage and the police inadvertently observed the drug paraphernalia in plain view, the evidence could have been seized without a warrant. *State v. Marquess,* 988 S.W.2d 123, 125 (Mo.App. W.D.1999)(citing *State v. Taylor,* 857 S.W.2d 482, 485 (Mo.App. S.D.1993), *cert. denied,* 510 U.S. 1056, 114 S.Ct. 719, 126 L.Ed.2d 683 (1994)).

▬▬▬ There is no absolute test for exigent circumstances; the determination that exigent circumstances are present is made on a case-by-case basis. *State v. Glisson,* 80 S.W.3d 915, 919 (Mo.App. S.D. 2002). "In assessing circumstances to determine if they were exigent, the circumstances are evaluated on the basis of how they would have appeared to prudent, cautious and trained officers." *Id.* "The justification for the exigency exception is time related, i.e., there is a need that will not brook the delay incident to obtaining a warrant." *Simmons,* 158 S.W.3d at 908. Exigent circumstances "exist if the time needed to obtain a warrant would endanger life, allow the suspect to escape, or risk the destruction of evidence." *Mahsman,* 157 S.W.3d at 249.

> Several factors are considered when deciding whether exigent circumstances exist [and thus justify warrantless arrests and warrantless searches]. They include: (1) that a grave offense is involved, particularly a violent crime; (2) the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe the suspect committed the offense; (4) strong reason to believe the suspect is in the premises to be entered; (5) a likelihood the suspect will escape if not swiftly apprehended; (6) the entry, though not consented, is made peaceably.

*State v. Varvil,* 686 S.W.2d 507, 512 (Mo.App.E.D.1985)(citing *State v. Timmons,* 574 S.W.2d 950, 955 (Mo.App.1978)).

The State argues that the exigent circumstance that justified the officers' entry into the garage was their fear for their safety and the safety of the two children inside the home. This fear, the State asserts, stemmed from the officers' inability to see what was occurring in the garage, Mr. Barker's history of violence and use of weapons, and the officer's knowledge that some of the chemicals used to manufacture methamphetamine are volatile and highly explosive. While all this may be true, the officers could justify their presence only because they had been granted limited consent, and to determine whether circumstances enhanced their authority to exceed that consent this court is required to consider what the officers had reason to believe when they placed themselves in a location within the house and when they entered the garage. *State v. Smith,* 926 S.W.2d 689, 693 (Mo.App. S.D.1996). Facts learned after the entry into the garage cannot justify the entry. *Id.* At the time Lt. Collie and Sgt. Parsons departed the living room, and placed themselves in a location to enter the garage and entered the garage, they did not know who the men were or what they carried into the garage. Lt. Judd testified that when he was watching the two men in the driveway, he did not know their identities. Lt. Collie testified that, when he entered the garage, he and Sgt. Parsons did not know the identity of the two men inside the garage. He further testified that, based upon the information he had, he believed the only residents of the home were Mr. Cromer,

Ms. Todd, and the two children, not Mr. Barker.

The question now presented is whether the law enforcement officers could reasonably assume that the two men were Mr. Cromer and Mr. Barker and that the materials they carried were methamphetamine or used to manufacture methamphetamine. The informant, which without additional information about the informant or the validity of prior information provided by him simply constituted a tipster, mentioned the residence's address and Mr. Cromer and Mr. Baker's names, and the two men entered the garage as though they freely accessed the premises. None of the officers stated that they assumed or thought that the two men were Mr. Cromer and Mr. Barker, however. When explicitly asked who the two men were, the officers stated that they did not know at that time. Further, Lt. Collie did not think Mr. Barker lived at the house as he testified that he believed only Mr. Cromer, Ms. Todd, and the two children lived there. The officers did not think that the two men were Mr. Cromer and Mr. Barker.

The officers were lawfully inside the living room because their entry into the residence had been in response to the consent of one with authority to admit them. The consent to enter did not extend to entering any other room or the garage. Their activity and presence in the home was even explicitly limited when Ms. Todd conversed by telephone with Sgt. Parsons. Neither did events that occurred after entry present exigent circumstances to justify the law enforcement officers' entry into any other place in the house. And absent other circumstances, not even was a "walk through" of the house justified to determine the absence of dangerous conditions or other persons simply because consent to enter the premises had been granted. The police officers were present in the living room because they had been permitted to enter only it. They had no other legal basis to justify their presence in the residence. They were not given consent to enter the garage, to proceed to a position to permit entry into the garage, or to Ms. Todd's bedroom, and no exigent circumstances occurred to change that. They were not pursuing a fleeing felon, and evidence of a crime was not being destroyed. Mr. Cromer and Mr. Barker were not aware the police were inside the house; they had no motive to destroy evidence, and the police did not believe evidence was being destroyed. As discussed, *supra*, neither did the officers have a reasonable basis to believe that they or other persons were in danger necessitating their entry into the garage, the only other category of exigent circumstances. The officers had no reasonable belief that the men were armed, and before entering the garage the officers were without probable cause to believe the men had committed a crime. Thus, no exigent circumstances existed to justify the law enforcement officers' entry into any part of the residence except the living room, and their "walk through" entry into Ms. Todd's bedroom to better observe anyone approaching the house, their placing themselves at the location to enter the garage, and their entry into the garage were in violation to the Fourth Amendment, the Fourteenth Amendment, and Article I, Section 15 of the Missouri Constitution. *See, e.g., State v. Varvil,* 686 S.W.2d 507 (Mo.App. E.D. 1985)(**no exigent circumstances where suspect was inside building and had been there for several hours, the entire area was staked out and there was little likelihood suspect could have escaped, the police had time to obtain warrant, and there were no victims in need of help inside the building, even though suspect was armed**); *State v. Diaz,* 134 N.H. 662, 596 A.2d 725 (1991)(**no exigency**

justifying police entry into motel room where defendant was found at site of drug deal, returned with police to hotel room to get identification, and spoke in foreign language to other occupant of room); *U.S. v. Garza*, 125 Fed.Appx. 927 (10th Cir.2005)(no exigency justifying police entry into bathroom where police went to motel to do "knock and talk" because of suspicion of drug trafficking, woman answered door and invited them inside, police heard bathroom door shut and woman said her boyfriend was in the bathroom, and man in bathroom would not answer police).

The legal situation the police officers experienced in this case is not unlike the hypothetical where the police department sends an officer into a neighborhood to foster goodwill and to improve community relations by knocking on a door and inviting people present to a social function sponsored by the police department. The officer knocks at the door of a resident and a person answers and invites her inside into the front living room. While inside talking to the person about the social event, the police officer notices a car being driven into the driveway. Its occupants, two men, take some unidentifiable items from the trunk of the vehicle and enter the garage. Few would dispute that the law would not permit the law enforcement officer in that situation, on her own initiative and with no more authority, to move from the living room through the house to entry to the garage and to enter the garage to see what the men are doing. The uncorroborated informant's tip and Mr. Barker's known history of violence do not grant any greater authority under the facts presented in this case than the police officer attempting to create goodwill would posses in the hypothetical. In both situations, the law enforcement officers were permitted entry into a restricted area of the residence by the consent of a resident. In

neither situation did law enforcement authorities have probable cause and no exigent circumstances existed to justify entry into the residence. And in neither did the situation change giving greater authority while the officers were inside the residences. The absence of a warrant or probable cause along with absence of exigent circumstances legally justifying the police officers movement about the house in search of a person or evidence of a crime, which would include authority to control the environment for their own safety and that of others, is precisely why the officers did a "knock and talk."

## Protective Sweep

The State's brief frequently mentions that the officers were conducting a protective sweep of the residence after the initial entry into the house. "A protective sweep is a 'quick and limited search of the premises, *incident to the arrest* and conducted to protect the safety of police officers and others.'" *Mahsman*, 157 S.W.3d at 250 (quoting *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)). There can be no protective sweep when "police enter a home where no one is under arrest and there is not even probable cause to arrest anyone." *Id.* (citing *United States v. Davis*, 290 F.3d 1239, 1242 n. 4 (10th Cir. 2002)). A protective sweep is "justified in connection with an in-home arrest if an officer reasonably believes that the area to be swept harbors an individual posing a danger to those at the arrest scene." *Rutter*, 93 S.W.3d at 725 (quoting *United States v. Boyd*, 180 F.3d 967, 975 (8th Cir.1999)). A protective sweep "occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime." *State v. Roberts*, 957 S.W.2d 449, 453 (Mo.App. W.D.1997) (quoting *Buie*, 494 U.S. at 333,

110 S.Ct. 1093). "The critical inquiry is whether a reasonably prudent person in similar circumstances would be warranted in the belief that his safety or that of others was in danger." *State v. Howes*, 150 S.W.3d 139, 144 (Mo.App. E.D.2004). The officer's reasonable belief "must be based on specific and articulable facts." *Rutter*, 93 S.W.3d at 725. The sweep may not be an in-depth search. It must only be a cursory inspection of spaces where a person might be hiding and must last no longer than necessary to dispel the suspicion of danger. *Id.*

At the time the officers entered the garage, there had not yet been an arrest. Thus, their walking through the house upon entry by consent cannot be construed a legal protective sweep. Missouri cases seem to allow a protective sweep without an arrest, but these cases reveal that what the court calls a protective sweep is really the officers entering pursuant to exigent circumstances. *See State v. Glisson*, 80 S.W.3d 915 (Mo.App. S.D.2002)(**extreme exigent circumstances justified protective sweep without an arrest**); *State v. Rowland*, 73 S.W.3d 818 (Mo.App. S.D.2002)(**protective sweep allowed without prior arrest because police were searching for victims**).

### Consent to Search the Home

 The State further contends that the evidence was admissible because Ms. Todd consented to a search of the home. In addition to the exigent circumstance exception to the warrant requirement, "a warrantless search conducted with proper consent, voluntarily given, is constitutionally valid." *State v. Smith*, 134 S.W.3d 35, 37 (Mo.App. E.D.2003). This is true even if "the search is not otherwise supported by probable cause or a reasonable suspicion of criminal activity." *Garcia*, 930 S.W.2d at 472. " 'Consent is free-

ly and voluntarily given if, considering the totality of all the circumstances, ... the objective observer would conclude that the person giving consent made a free and unconstrained choice to do so.' " *State v. Faulkner*, 103 S.W.3d 346, 355 (Mo.App. S.D.2003)(quoting *State v. Sullivan*, 49 S.W.3d 800, 813 (Mo.App. W.D.2001)). " 'A court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have been communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' " *Id.* (quoting *State v. Solt*, 48 S.W.3d 677, 680–81 (Mo. App. S.D.2001)). Factors used to determine whether consent to a search was given voluntarily include, but are not limited to: (1) the number of officers present; (2) the degree to which the officers emphasized their authority; (3) whether weapons were displayed; (4) whether the officers were misleading or fraudulent; and (5) evidence regarding what was said or done by the person giving the consent. *Rankin v. Venator Group Retail, Inc.*, 93 S.W.3d 814, 822 (Mo.App. E.D.2002). The State has the burden of proving consent was voluntarily and freely given. *Faulkner*, 103 S.W.3d at 355. Consent cannot be coerced, either implicitly or explicitly. *State v. Earl*, 140 S.W.3d 639, 641 (Mo. App. W.D.2004).

Ms. Todd initially consented by telephone to a search of the home but insisted that the search not occur until she arrived home from work. When Ms. Todd arrived home, she did not immediately consent to the search. Instead, she was concerned about her children and Mr. Cromer, who she believed was confused and upset and being questioned in her bedroom. She spoke with her children and then asked to speak with Mr. Cromer. She was allowed to go into the bedroom where he was being questioned. After talking with Mr. Crom-

er, Ms. Todd verbally consented to a search of the residence, which included the garage.

Ms. Todd testified that she was afraid that if she did not cooperate with the police that her children would be taken away from her and placed in the custody of the Department of Family Services (DFS). According to her, this fear motivated her consent and made it involuntary. Ms. Todd further testified that when she returned home, the officers never threatened her with anything, never said they were going to arrest her, and never said that DFS would take her children away if she did not consent to a search. No evidence shows that when Ms. Todd consented to the search she was mistreated or inappropriately intimidated by law enforcement officers. Her fear alone, without more, is not enough to render her consent involuntary to an objective observer.

When Ms. Todd arrived home, she spoke with Mr. Cromer and her children. Having been fully apprised of the situation, she chose to consent to a search of her home. As noted, *supra*, there was no indication of police coercion or intimidation. Ms. Todd's constitutional rights had not been violated, and the illegal seizure of Mr. Cromer did not impact on the voluntariness of her consent. She consented to a search of her home, her primary residence. Because it was an area over which she had authority, she could legally consent to a search even if Mr. Cromer would not or had not. *See State v. Smith*, 850 S.W.2d 934, 941 (Mo.App. S.D.1993); *State v. Smith*, 966 S.W.2d 1, 7 (Mo.App. W.D. 1997). Her consent was valid and the evidence seized by the police in the subsequent search of the home was properly admitted at trial.[3]

The illegal entry into and seizure of Mr. Cromer in the garage by the police, however, does require that the items carried into the garage by Mr. Barker and Mr. Cromer be suppressed. Despite the fact that the items then being carried by Mr. Cromer and Mr. Barker were in plain view, the police were illegally in the garage at the time they viewed the items. The subsequent seizure of Mr. Cromer breached the Fourth Amendment, as the police had neither a warrant nor an exception to the warrant requirement at the time the arrest occurred. The evidence carried into the garage by Mr. Barker and Mr. Cromer was in the plain view of law enforcement only because law enforcement violated Mr. Cromer's constitutional rights.

Ms. Todd's subsequent consent to search the home does not render the evidence carried into the garage admissible. Without the illegal interruption of the law enforcement officers, what Mr. Barker and Mr. Cromer would have done with the items they carried into the garage is unknown. Any number of scenarios is plausible; perhaps had Mr. Barker and Mr. Cromer left the items in the garage and entered the house and observed the police officers present they would have left through the garage with the items covered. The items carried into the garage by Mr. Barker and Mr. Cromer were still present in the garage at the time the law enforcement officers searched the residence pursuant to Ms. Todd's valid consent because the officers illegally entered the garage, recognized the items as drug paraphernalia, ordered Mr. Barker and Mr. Cromer to put the items down on the garage floor, illegally seized Mr. Barker and Mr. Cromer, and prevented them from moving the items elsewhere. The law enforcement officers found the items on the

---

**3.** Because Ms. Todd's consent was valid, this court need not address the effect of the illegal seizure of Mr. Cromer on his consent with respect to the search of the home.

garage floor when they were conducting the consent search because that is where the officers ensured the items would be when they illegally entered the garage and seized Mr. Barker and Mr. Cromer. If the guarantees of the Fourth Amendment are to have any meaning, the items carried into the garage must be suppressed.

The record is not clear regarding exactly what items were carried into the garage by Mr. Cromer and Mr. Barker, except for the two buckets of dry ice and a clear liquid, and what items were found elsewhere in the garage during the consent search. On remand, the trial court is instructed to make a finding regarding what evidence was carried into the garage by Mr. Barker and Mr. Cromer and what evidence was located elsewhere in the garage. It is further instructed to suppress the evidence carried into the garage by Mr. Barker and Mr. Cromer on the occasion of the seizure of the two men.

### Conclusion

The seizure of Mr. Cromer in his garage was in violation of law. The officers did not have a warrant, no exigent circumstances existed, and they did not have permission to enter the garage. Because of this, the items carried into the garage by Mr. Barker and Mr. Cromer on this occasion must be suppressed as law enforcement officers were not legally in the garage when the items were in their plain view. However, Ms. Todd subsequently consented to a search of her home. This consent was valid and the evidence found in the garage during the course of this legal search, with the exception of the items carried into the garage by Mr. Barker and Mr. Cromer, was properly admitted at trial.

The motion to suppress should have been granted with respect to the evidence Mr. Barker and Mr. Cromer carried into the garage on the occasion of their seizure. The judgment of convictions is reversed and the cause is remanded for action consistent with this opinion and for a new trial.

All concur.