

# Missouri Court of Appeals
## Southern District
### Division Two

STATE OF MISSOURI,                          )
                                            )
    Plaintiff-Respondent,          )
                                            )
vs.                                         )    No. SD32636
                                            )
TENA D. CADY,                               )    Filed April 2, 2014
                                            )
    Defendant-Appellant.           )

### APPEAL FROM THE CIRCUIT COURT OF LAWRENCE COUNTY

Honorable Carr L. Woods, Senior Judge

<u>AFFIRMED</u>

Tena D. Cady ("Defendant") appeals her conviction on two counts of attempt to manufacture a controlled substance, *see* section 195.211.[1] Defendant raises three points on appeal: first, that the trial court erred in overruling her motion to suppress and her continuing objection to the admission of evidence found during the search of her shop building because the shop building was located within the curtilage of her property, rendering the initial "knock and talk" improper, and because any subsequent consent to search was involuntary; second, that the trial court erred in admitting NPLEx records into evidence, as the records contained hearsay and were not adequately shown to fall under any recognized exception to the hearsay rule; and third, that the trial court erred in admitting NPLEx records into evidence because their admission

---

[1] All references to section 195.211 are to RSMo Cum.Supp. 2003.

violated Defendant's right to confrontation.  Finding no merit in any of Defendant's points, we affirm.

**Factual and Procedural Background**

Viewed in the light most favorable to the verdict, *see **State v. Sund***, 215 S.W.3d 719, 723 (Mo. banc 2007), the following evidence was adduced at trial.

On October 20, 2010, Trooper Kelsey Rutledge of the Missouri State Highway Patrol received information that Joe Cady, Defendant's husband, was manufacturing methamphetamine in a shop building located near the couple's residence in Lawrence County.  Trooper Rutledge and three additional officers arrived at Defendant's property at approximately 10:00 p.m. that evening.  A gravel driveway led from the road to the house and continued past the house to the shop building.  The house and the shop building were visible from the road and neither was enclosed by a fence.  Two officers stopped at the house while Trooper Rutledge and the remaining officer continued on to the shop building; Trooper Rutledge intended to conduct a "knock and talk."

Trooper Rutledge, who is trained in drug detection, smelled the strong chemical odor associated with the manufacture of methamphetamine immediately upon exiting his vehicle.  Trooper Rutledge approached the shop building, knocked on the door, and said, "Joe, are you here?"  A male voice responded, "Yeah, right here."  Trooper Rutledge asked the man if he would step outside so they could talk, after which Trooper Rutledge heard what sounded like someone running through the shop building in the opposite direction.

Because he feared whoever was inside the shop building would destroy any evidence that might be inside, Trooper Rutledge and the other officer entered the shop building, running through it quickly in order to clear the building of any other people; this initial entry of the shop building lasted approximately one minute.  While inside, Trooper Rutledge noticed numerous

2

chemicals and paraphernalia associated with the manufacture of methamphetamine. Upon reaching the opposite end of the shop building, Trooper Rutledge heard what sounded like someone running through the brush outside. Trooper Rutledge and the other officer pursued the fleeing individual and, as they exited the shop building, Trooper Rutledge saw marijuana plants, some in excess of six-feet tall, commingled with vegetable plants in a large garden located between the shop building and the house, as well as additional marijuana plants along a perimeter fence.

Approximately one hour later, Trooper Rutledge and the other officer found Dennis Grider hiding in the nearby woods behind some abandoned cars. Grider had a pair of rubberized cotton gloves in his hip pocket; an identical pair of rubberized cotton gloves was found inside the shop building, adjacent to the chemicals being used to manufacture methamphetamine. Grider was placed under arrest and transported to jail, while Trooper Rutledge returned to Defendant's property.

When Trooper Rutledge returned, he found the two officers who had approached the house sitting inside the house talking with Defendant's two sons, ages 17 and 19, a girlfriend of one of the boys, and another young individual. Defendant arrived at the property a short time later. Trooper Rutledge informed Defendant of what he had found inside and around the shop building, namely the chemicals used for the manufacture of methamphetamine and the marijuana plants. Trooper Rutledge placed Defendant under arrest and advised her of her *Miranda*[2] rights; Trooper Rutledge did not handcuff Defendant. Defendant admitted knowing about the marijuana plants but told Trooper Rutledge "that they were being tended to by her husband Joe." When asked about the chemicals that had been found, Defendant said, "[T]hat wasn't any of her business. . . . That's Joe's business."

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3

During the initial pursuit of Dennis Grider, Trooper Rutledge had called Sergeant

Danielle Heil, a narcotics investigator in the Highway Patrol's Division of Drug and Crime

Control; she arrived at the property sometime after 11:00 p.m. and found Trooper Rutledge and

two officers outside in the driveway and Defendant and her two sons inside the house. Sergeant

Heil, Trooper Rutledge, and the two other officers questioned Defendant about her husband's

whereabouts, but Defendant stated that she did not know where he was. Sergeant Heil did not

handcuff Defendant, and no law enforcement officer mentioned taking Defendant to jail or drew

a weapon on Defendant. Sergeant Heil asked for permission to search the premises, and

Defendant and her sons agreed. Sergeant Heil filled out a consent-to-search form allowing her to

search the house and the shop building in Defendant's presence, went over the form with

Defendant and her sons, and Defendant and her sons each signed the form. Defendant later

stated that she signed the consent form because she "didn't think [she] had anything to worry

about."

Defendant led the officers through the house and was generally cooperative, pointing out

drugs and drug paraphernalia along the way. The officers seized marijuana, foil containing

methamphetamine residue, and paraphernalia from Defendant's bedroom. Marijuana and

paraphernalia were also found in the bedroom of one of Defendant's sons.

Inside the shop building, the officers found approximately seven pounds of processed

marijuana. They also found chemicals and components used to manufacture methamphetamine,

including three 48-count boxes of "Wal-Act" brand pseudoephedrine pills and a jar containing a

bi-phase liquid representative of methamphetamine in the final stages of production; the bi-phase

liquid was later confirmed to be methamphetamine. An anhydrous ammonia generator was still

smoking during the search, indicating that someone had recently been in the process of making

4

methamphetamine with anhydrous ammonia. There was a strong chemical odor in the area around the shop building. In addition to the chemicals and methamphetamine-production components, the officers seized glass pipes, two rifles, and a shotgun from inside the shop building, some of which were located behind a door that Defendant unlocked. A total of 32 marijuana plants were also seized, most of which had been interspersed with tomato plants in the garden outside the shop building; a dryer found inside the shop building was being used to dry marijuana. The marijuana plant material seized from the property totaled 4.67028 kilograms. Defendant was released and was not taken to jail that night.

Shortly thereafter, Trooper Rutledge continued his investigation by accessing records of Defendant's purchases of pseudoephedrine using records from the National Precursor Log Exchange ("NPLEx").[3] The NPLEx records showed that between January 15, 2010, and January 3, 2011, Defendant made ten pseudoephedrine purchases; she attempted an additional seven pseudoephedrine purchases but was stopped from doing so because she had already reached the statutory limit of nine grams of pseudoephedrine per thirty-day period. In particular, Defendant purchased a 48-count box of Wal-Act pseudoephedrine tablets on October 8, 2010, and again on October 18, 2010, with each box containing 2.88 grams of pseudoephedrine. It would be unusual for an individual to consume in a legitimate manner that much pseudoephedrine in such a short time. Defendant claimed that she purchased the pseudoephedrine for her allergies, however no pills were found anywhere on the property except in the shop building.

After charges were filed against Defendant, she filed a motion to suppress all evidence found on her property on October 20, 2010, as well as any testimony regarding that evidence.

---

[3] The NPLEx database was created in August 2010 and "tracks all purchases of products containing pseudoephedrine. Missouri is a member of NPLEx. A buyer must present identification at the time of purchase of any product containing pseudoephedrine, whereupon the buyer's name is immediately recorded into the national database." *State v. Solis*, 409 S.W.3d 584, 588 n.3 (Mo.App. 2013).

5

Defendant alleged that, although Trooper Rutledge and the other officers had the right to approach the house for a "knock and talk," they did not have the right to approach the shop building in the same manner because she had an expectation of privacy in that portion of her property. She further argued that any subsequent consent to search the property was involuntary because, "where there's initially an invalid search[,] you can't correct that by later getting the person to consent to the search." The trial court denied Defendant's motion, which she renewed on the first day of trial. Defendant then asked for a continuing objection to the admission of any evidence and testimony resulting from the search on her property, which was granted by the trial court without objection by the State.

At trial, before the State mentioned the NPLEx records in its opening statement, Defendant objected on the basis that the NPLEx records were testimonial in nature, as they are used in prosecutions. Defendant further objected that the State had failed to identify a custodian for the records or prepare an appropriate business-records affidavit. Both objections were overruled. Defendant made similar objections when the State attempted to admit State's Exhibit #56—the NPLEx records—into evidence; both objections were again overruled.

A jury found Defendant guilty of attempt to manufacture marijuana and attempt to manufacture methamphetamine, and she was sentenced to five years' and 12 years' imprisonment, respectively, with the sentences to run concurrently. This appeal followed.

## Both Searches of Shop Building were Legal

In her first point, Defendant claims that the trial court erred in overruling her motion to suppress and continuing objection to the admission of evidence found during the search of her property because the shop building is located within the curtilage of her property and the officers acted outside of their authority in approaching the shop building for a "knock and talk"; accordingly, Defendant contends that any later consent to search the property was not

6

sufficiently attenuated from the initial illegal search. Defendant further contends that her later consent to search the property was involuntary. We disagree.

### Standard of Review

We review the denial of a motion to suppress for clear error, which occurs when "we are left with the definite and firm impression that a mistake has been made." *State v. Kriley*, 976 S.W.2d 16, 19 (Mo.App. 1998). In doing so, we "defer[] to the trial court's factual findings and credibility determinations, *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998), and consider[] all evidence and reasonable inferences in the light most favorable to the trial court's ruling." *Sund*, 215 S.W.3d at 723. Whether conduct constitutes a violation of the Fourth Amendment is an issue of law, which we review *de novo*. *Id.*

### Knock and Talk at Shop Building was Lawful

We first turn to Defendant's contention that the knock and talk conducted by Trooper Rutledge and the officer with him at the shop building on the night in question was unlawful. "[A] 'knock and talk' is employed when law enforcement officers receive information relating to illegal drug activity that they believe has merit but is insufficient to obtain a warrant[.]" *State v. Cromer*, 186 S.W.3d 333, 342 (Mo.App. 2005). Essentially, officers go to the referenced location, knock on the door, speak with whomever answers the door, and try to obtain consent to search the premises. *Id.* "Law enforcement officers are legally permitted to knock on the door of a private residence and seek consent to enter and search without probable cause or a warrant." *Id.*

Defendant acknowledges that "a law enforcement officer's warrantless presence at a residence, without any other justification, allows him or her to investigate a crime or to conduct official business at a residence in places where the public is invited." *State v. Kriley*, 976 S.W.2d 16, 22 (Mo.App. 1998). While conceding that law enforcement had a legal right to be

7

present and conduct a knock-and-talk at the front door of her residence, Defendant posits that because the shop building was within the curtilage of her residence "and the public was not welcome at the shop building," Trooper Rutledge and the officer with him had no legal right to be present at the door of the shop building to conduct a knock-and-talk. Logically, Defendant's argument fails if either premise is incorrect. The first premise of Defendant's argument—the shop building was within the curtilage of her residence—is not correct.

"The protection of the Fourth Amendment extends to the curtilage of a person's home." *State v. Adams*, 791 S.W.2d 873, 877 (Mo.App. 1990). "[T]he 'curtilage' of a person's home is generally defined as the enclosed space of ground and buildings immediately surrounding a dwelling house." *State v. Edwards*, 36 S.W.3d 22, 26 (Mo.App. 2000). This "includes all out-buildings used in connection with the residence, such as garages, sheds, barns, yards, and lots connected with or in the close vicinity of the residence." *State v. Berry*, 92 S.W.3d 823, 829 (Mo.App. 2003) (internal quotation marks omitted).

> Whether or not an area surrounding a dwelling is within the dwelling's "curtilage" is generally assessed on a case-by-case basis, weighing four factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) steps taken to protect the area from observation by people passing by.

*Edwards*, 36 S.W.3d at 26 n.2; *see also* *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). "The term 'curtilage' has no application to any building not used as a dwelling." *State v. Woodrome*, 407 S.W.3d 702, 707-08 (Mo.App. 2013) (internal quotation marks omitted).

Here, a review of the evidence pertaining to the physical location and attributes of the shop building and surrounding area supports that the shop building is not part of the curtilage of Defendant's residence. First, Trooper Rutledge testified that the shop building sits some 100

8

yards from Defendant's house; a distance of 100 yards is not "immediately surrounding" or "in the close vicinity of the residence." *See, e.g., **State v. Hunziker***, 799 S.W.2d 610, 613 (Mo.App. 1990) (finding a shed located approximately 100 feet from the house outside the curtilage); ***State v. Simpson***, 639 S.W.2d 230, 232 (Mo.App. 1982) (finding a field containing marijuana plants located 100 yards from the residence outside the curtilage).

Second, there was no evidence that the area surrounding the shop building is enclosed. In fact, State's Exhibits 46 and 47—photographs of the shop building, house, and surrounding property—indicate that there is no fence or other barrier enclosing the house and shop building from the public. Defendant concedes that there is no fence surrounding the residence. The lack of a surrounding fence is a factor supporting that the shop building is outside the curtilage of Defendant's residence. *See, e.g., **Hunziker***, 799 S.W.2d at 613 (finding a shed to be outside the curtilage where there was no fence around the residence or outbuildings).

Third, there was no evidence that the shop building is used to carry on the "intimate activities of the home" as is required for a structure to be included within a dwelling's curtilage. *See **id***. Rather, testimony and photographic evidence indicate that the area surrounding the shop building is strewn with scrap items and unwanted debris, such as inoperable vehicles, rusted barrels, and multiple sinks. Use of the shop building as a dumping ground for trash does not elevate the shop building to a status equal to that of a residence. *See **United States v. Mooring***, 137 F.3d 595, 596 (8th Cir. 1998). Furthermore, Trooper Rutledge testified to a strong chemical odor associated with methamphetamine, which he noticed immediately upon exiting his vehicle; such evidence is indicative of a building not being used to continue the intimate activities of the home. *See **Dunn***, 480 U.S. at 302-03.

Finally, Trooper Rutledge testified that, although there are trees growing around the house and to the east of the property, the shop building, including its front door, is visible from the road. He further testified that the driveway goes past the house and to the shop building.

> If an occupant permits visitors to enter onto portions of the property, such as the driveway or front walk, so as to reach the door, or if such areas are visible from outside the property, then the occupant is generally held not to have a reasonable expectation of privacy in those portions of the property.

*Edwards*, 36 S.W.3d at 27.

None of the four factors used in determining whether a particular area of an individual's property is included in the curtilage indicate or support the shop building's inclusion here. Because the shop building was not part of the curtilage of her residence, Trooper Rutledge and the accompanying officer were exercising their lawful authority to conduct the knock-and-talk. *See Hunziker*, 799 S.W.2d at 613 ("[A]ny area not within the curtilage of the residence may be searched without a warrant under the open fields doctrine.").[4]

### Defendant's Consent to Search was Voluntary

Because the officers' presence at the shop building door was lawful, there is no "poisonous tree," the fruit of which must be excluded, as argued by Defendant. Thus, any subsequent consent to search the shop building cannot be disqualified as tainted by that presence. While the legal fruit of the initial search of the shop building provides probable cause for the subsequent search, we must still examine the voluntariness of Defendant's consent to search the property in order to determine whether the subsequent warrantless search was valid.

"[A] warrantless search conducted with proper consent, voluntarily given, is constitutionally valid." *Cromer*, 186 S.W.3d at 347 (internal quotation marks omitted).

---

[4] Defendant does not challenge the lawfulness of the subsequent entry into the shop building based upon information obtained after Trooper Rutledge exited his vehicle and knocked on the shop building door.

Consent is freely and voluntarily given if, considering the totality of all the circumstances, . . . the objective observer would conclude that the person giving consent made a free and unconstrained choice to do so. A court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have been communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. Factors used to determine whether consent to a search was given voluntarily include, but are not limited to: (1) the number of officers present; (2) the degree to which the officers emphasized their authority; (3) whether weapons were displayed; (4) whether the officers were misleading or fraudulent; and (5) evidence regarding what was said or done by the person giving the consent.

*Id.* (internal quotation marks and citations omitted).

Here, Trooper Rutledge, Sergeant Heil, and two other law enforcement officers were present at the time Defendant consented to the search of her property. Four officers is not an unreasonable or overwhelming number, *see State v. White*, 755 S.W.2d 363, 365 (Mo.App. 1988), especially considering that, at minimum, Defendant's two sons were also present in the room. While Trooper Rutledge had placed Defendant under arrest before obtaining her consent to search, being in custody does not automatically preclude voluntary consent. *See State v. Taylor*, 917 S.W.2d 222, 225 (Mo.App. 1996). Moreover, Trooper Rutledge had read Defendant the *Miranda* warnings. She was not handcuffed, and no guns or other weapons were drawn. The record is devoid of any evidence of deception or fraud on the part of law enforcement. By her own admission, Defendant signed the consent form because she "didn't think [she] had anything to worry about." She even went so far as to assist the officers in conducting the search, unlocking doors, leading them through the property, and directing their attention to illegal items. When considered in their totality, the circumstances indicate that Defendant voluntarily consented to the subsequent search of her property, including the shop building. There was thus no error in the trial court's decision overruling Defendant's motion to suppress and her accompanying objections at trial. Defendant's first point is denied.

11

**State's Exhibit #56 (NPLEx Records) Admissible**

In her second and third points, Defendant challenges the admission of State's Exhibit #56, claiming that the trial court erred in allowing it into evidence, first, because the State failed to establish a sufficient foundation for its admission under either the official documents or business records exceptions and, second, because the NPLEx records are testimonial in nature and their admission thus constituted a violation of her right to confrontation. We disagree with both claims.

### Section 195.017.21 Establishes Foundation for Admission of Records to Create Rebuttable Presumption as to the Identity of Purchaser of Pseudoephedrine Products

> A trial court has broad discretion to admit or exclude evidence at trial. This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion. [T]hat discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Additionally, on direct appeal, this Court reviews the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial.

*State v. Forrest*, 183 S.W.3d 218, 223-24 (Mo. banc 2006) (internal quotation marks and citations omitted).

Sections 195.017 and 195.417,[5] as implemented by 19 C.S.R. 30-1.074, govern the sale of pseudoephedrine in Missouri. Any product containing pseudoephedrine must be sold only by a registered pharmacist or a registered pharmacy technician from behind a pharmacy counter "where the public is not permitted." Section 195.017.11(1); section 195.417.4. Any person purchasing such product must be at least eighteen years old and provide acceptable photographic identification verifying that fact by date of birth. Section 195.017.11(2) and (3). The seller must "deliver the product directly into the custody of the purchaser." Section 195.017.11 (4). Such

---

[5] All references to section 195.017 and 195.417 are to RSMo Cum.Supp. 2010.

12

sellers must maintain an electronic log of each pseudoephedrine product transaction, which must include each purchaser's name, address, and signature; the amount of pseudoephedrine purchased; the date and time of each purchase; and the name or initials of the individual who dispensed the pseudoephedrine to the purchaser. Section 195.017.12. This information is then required to be transmitted in real time to an electronic pseudoephedrine tracking system maintained by the Missouri Department of Health and Senior Services ("DHSS"). Section 195.017.13; section 195.417.5; 19 C.S.R. 30-1.074(3)(C). Only law enforcement agencies have access to this database and, in order for a particular law enforcement officer to gain access, he or she must request access through the chief, sheriff, or chief executive officer of his or her particular agency, who must then, in writing, request the officer's access from DHSS. 19 C.S.R. 30-1.074(3)(N); *see* section 195.417.7. Any knowing or reckless violation of subsections 11 through 15 of section 195.017 or any provision of section 195.417 constitutes a class A misdemeanor. Section 195.017.16; section 195.417.9.

Both Defendant and the State focus their arguments under this point on whether the NPLEx records comprising State's Exhibit #56 constitute an official public record or a business record. Neither argument is on point, however, because subsection 21 of section 195.017 states, "Logs of transactions required to be kept and maintained by this section and section 195.417 *shall create a rebuttable presumption* that the person whose name appears in the logs is the person whose transactions are recorded in the logs." (Emphasis added). This evidentiary presumption is established by the "[l]ogs of transactions required to be kept and maintained by" sections 195.017 and 195.417. Therefore, under the clear and plain language of this statue, so long as a foundation is laid establishing that the records at issue are "[l]ogs of transactions required to be kept and maintained by" sections 195.017 and 195.417, those records are

admissible in evidence to "create a rebuttable presumption" as to the identity of the purchaser in the transactions shown in those records.

Here, Trooper Rutledge identified State's Exhibit #56 as an "NPLEx printout record which details the pseudoephedrine purchases of [Defendant] from August through December 2010." Trooper Rutledge further testified that NPLEx is the database referenced in the applicable Missouri statutes, outlined the process by which an individual must proceed to purchase pseudoephedrine pursuant to the relevant statutes, and detailed the process he underwent to gain access to the NPLEx system. Such testimony, all in accordance with the requirements of sections 195.017 and 195.417, authenticated State's Exhibit #56 as "[l]ogs of transactions required to be kept and maintained by" sections 195.017 and 195.417, and thereby provided a proper foundation for its admission in evidence.

Because State's Exhibit #56 was admissible under section 195.017.21 to create the rebuttable presumption contained in that section, whether it was otherwise admissible as an official public record or a business record, as argued by the parties, is irrelevant. The trial court did not abuse its discretion in admitting it into evidence under the provisions of section 195.017.21. Defendant's second point is denied.

### *NPLEx Records Not Testimonial*

The trial court also did not err in admitting the NPLEx records over Defendant's objection that such records violated her right to confrontation. The Confrontation Clause states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "In *Crawford v. Washington*, [541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)], the United States Supreme Court held that the Confrontation Clause demands that all *testimonial* evidence be excluded unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination." *State v.*

*March*, 216 S.W.3d 663, 665 (Mo. banc 2007) (citing *Crawford*, 541 U.S. at 68).  Thus, the

paramount inquiry here is whether the NPLEx records are considered testimonial under

*Crawford*.  This inquiry concerns a question of law that this Court reviews *de novo*.  *March*, 216

S.W.3d at 664-65.

Although the Court in *Crawford* did not offer a precise definition of "testimonial," it did

delineate "three useful 'formulations of this core class of "testimonial" statements':

> (1) '*ex parte* in-court testimony or its functional equivalent—that is, material such
> as affidavits, custodial examinations, prior testimony that the defendant was
> unable to cross-examine, or similar pretrial statements that declarants would
> reasonably expect to be used prosecutorially,'
>
> (2) 'extrajudicial statements . . . contained in affidavits, depositions, prior
> testimony, or confessions,' and
>
> (3) 'statements that were made under circumstances which would lead an
> objective witness reasonably to believe that the statement would be available for
> use at a later trial.'"

*March*, 216 S.W.3d at 666 (quoting *Crawford*, 541 U.S. at 51-52).  The United States Supreme

Court later elaborated on what constitutes a testimonial statement in *Davis v. Washington*, 547

U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), holding "that a statement made in response to

police interrogation is testimony when its 'primary purpose' is not to respond to an ongoing

emergency but 'to establish or prove past events potentially relevant to later criminal

prosecution.'"  *March*, 216 S.W.3d at 666 (quoting *Davis*, 547 U.S. at 822).

Using the examples of "testimonial" in *Crawford* and the "primary purpose" test outlined

in *Davis*, it is clear that the NPLEx records at issue in this case are not "testimonial" for purposes

of the Confrontation Clause.  As Trooper Rutledge testified, "The intent of [the NPLEx] program

is to prevent people from purchasing pseudoephedrine to manufacture methamphetamine[,]" not,

as Defendant argues, to be used at a later criminal prosecution.  This is evidenced by the

statutory requirement that pharmacies enter the information identifying the purchaser into the

15

database at the point of sale, thus enabling the pharmacist to instantly discern whether the purchaser has reached his or her daily or monthly limit of permitted pseudoephedrine purchases, *see* section 195.417, subsections 2 and 3, and block any excess purchases. Section 195.017.13; 19 C.S.R. 30-1.074. The real-time compilation of pseudoephedrine purchases likewise does not fall under any of the three examples of testimonial statements identified in *Crawford*, which focus on statements and documents prepared specifically for use in a criminal prosecution.

Defendant urges us to view the NPLEx records as analogous to a laboratory report, such as that in *March*; in that case, our Supreme Court found a laboratory report identifying a substance seized from the defendant's custody as cocaine to be testimonial in nature, thereby invoking the Confrontation Clause.[6] 216 S.W.3d at 665-67. The relevant information in the laboratory report in *March*, however, was prepared and analyzed well after the underlying criminal activity and arrest, and it was created in direct response to a law enforcement officer's production of the suspected illegal substance in furtherance of the officer's goal of proving an element of the alleged crime. The records at issue here merely consist of a printout containing information entered and amassed at the time Defendant purchased or attempted to purchase pseudoephedrine. Those entries were made and recorded regardless of whether Defendant thereafter committed a crime with the purchased product. To the extent that they consist of a compilation of several discreet items of non-criminal data that occurred at an identifiable place and time without further analysis, the NPLEx records more closely resemble telephone records, s*ee United States v. Yeley-Davis*, 632 F.3d 673, 679 (10th Cir. 2011) (cellular telephone records kept by telephone company are not testimonial), rather than a laboratory report analyzing a

---

[6] Similar to *March*, Defendant's reply brief also cites us to *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) (evidence affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine were testimonial) and *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011) (report of analyst who certified defendant's blood-alcohol content for purpose of prosecution on driving while intoxicated charge was testimonial).

seized compound prepared for the sole purpose of proving in a prosecution of a crime the presence of illegal substances.

Moreover, simply because a piece of evidence *can* be used in a criminal prosecution does not make that use its *primary* purpose. The use of the word "primary" by the Supreme Court in ***Davis*** implies that a piece of evidence may have multiple purposes and, indeed, seems to imply specifically that one of those alternative purposes may be use in a criminal prosecution, so long as use in a criminal prosecution is not the *primary* purpose. That is, the fact that the record of an individual's pseudoephedrine purchases might be used later on in a criminal prosecution does not negate the primary purpose of the NPLEx registry: to limit the purchase of pseudoephedrine in order to limit the ability to manufacture methamphetamine.

Because the NPLEx records are not testimonial in nature, Defendant's right of confrontation was not violated, and the trial court did not err in admitting the NPLEx records. Defendant's third point is denied.

## Decision

Defendant's convictions are affirmed.


GARY W. LYNCH, J. - Opinion author

DON E. BURRELL, J. - concurs

MARY W. SHEFFIELD, J. - concurs

17