

# In the Missouri Court of Appeals
## Western District

STATE OF MISSOURI, DEPARTMENT )
OF MENTAL HEALTH, )
                Appellant, )
v. )        WD83607
)
ROBERT J. ROUSSEAU, JR., )        FILED: January 26, 2021
              Respondent. )

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### THE HONORABLE BRYAN ROUND, JUDGE

### BEFORE DIVISION TWO: W. DOUGLAS THOMSON, PRESIDING JUDGE, LISA WHITE HARDWICK AND EDWARD R. ARDINI, JR., JUDGES

The Missouri Department of Mental Health ("DMH") appeals the circuit court's grant of conditional release of Robert Rousseau from DMH custody. DMH contends that the circuit court erred because Rousseau did not present clear and convincing evidence that he was not likely to be dangerous throughout his release. DMH also contends that the court erroneously applied the law by relying on the presumptions of medical professionals to find that Rousseau met the requirement for conditional release. For reasons stated herein, we affirm the judgment.

### FACTUAL AND PROCEDURAL HISTORY

Rousseau has a longstanding diagnosis of paranoid schizophrenia. In 1990, while in a nightclub, Rousseau responded to auditory hallucinations that compelled him to stab and kill a woman, Megan Wood, whom he did not know. In the ensuing trial, Rousseau was found not guilty by reason of insanity and was committed to DMH.

In February 1996, Rousseau was granted a conditional release from the St. Joseph State Hospital. While conditionally released, Rousseau again responded to hallucinations compelling him to travel to Israel. Despite experiencing psychotic symptoms, Rousseau told his social worker only that he was "stressed" and needed a change in his medication. Rousseau ultimately flew to Israel in violation of the terms of his release and remained there for four days before returning to the United States. Rousseau's trip to Israel was "uneventful," and he was arrested upon his return while trying to visit his mother in California. Rousseau returned to DMH custody, where he has remained since.

Rousseau again applied for conditional release in 2011 and 2018. His 2011 application was denied, and his 2018 application proceeded to a bench trial. After hearing the evidence, the circuit court granted Rousseau's conditional release from DMH custody for one year. The order included a plan for Rousseau to be housed in facility under strict conditions to follow the DMH rules and regulations, as well as directives from his DMH forensic case manager. Rousseau was also ordered to follow ongoing security directives, treatment, and medical orders, in addition to being subject to random drug and alcohol testing. DMH appeals.

## STANDARD OF REVIEW

When reviewing a court-tried case for an application of conditional release, we affirm the decision "unless it is not supported by substantial evidence, is against the weight of the evidence, or it erroneously declares or applies the law." *In re George*, 45 S.W.3d 516, 518 (Mo. App. 2001). We give deference to the circuit court's findings of fact and credibility determinations. *State v. Cromer*, 186 S.W.3d 333, 341 (Mo. App. 2005); *State v. Gratts*, 112 S.W.3d 12, 19 (Mo. App. 2003).

## ANALYSIS

In its first point, DMH contends the circuit court erred in granting Rousseau's conditional release because Rousseau failed to present clear and convincing evidence that he was not likely to be dangerous if released. "[A] committed person . . . may file an application in the court having probate jurisdiction over the facility where the person is detained for a hearing to determine whether the committed person shall be released conditionally." § 552.040.10, RSMo 2016.[1] "The burden of persuasion for any person committed to a mental health facility under the provisions of this section . . . shall be on the party seeking release to prove by clear and convincing evidence that the person for whom release is sought is not likely to be dangerous to others while on

---

[1] All statutory references are the to the Revised Statutes of Missouri 2016.

3

conditional release." § 552.040.12. Clear and convincing evidence is "'evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition,' so that the court is left with . . . 'the abiding conviction that the evidence is true.'" *Greeno v. State*, 59 S.W.3d 500, 505 (Mo. banc 2001) (citing *In re S.H.*, 915 S.W.2d 399, 403 (Mo. App. 1996)).

The circuit court summarized the evidence as follows:

The State's evidence in support of its position seeking a denial of Mr. Rousseau's request for conditional release can be summarized as follows: 1) Dr. James Reynolds' review of Mr. Rousseau's file, including a detailed history of his offense and treatment, acknowledging that he is not and has never been Mr. Rousseau's treating psychiatrist; 2) Dr. Reynolds' twenty-five (25) minute conversation with Mr. Rousseau in April of 2019; 3) cross-examination of other witnesses; and 4) the victim impact statement noting the terrible toll this crime has taken on her family, provided by Ms. Mary Kathleen McInerny Wood, the mother-in-law of the Defendant's stabbing victim, Megan Wood.

The evidence presented in support of Mr. Rousseau's request for a conditional release includes the testimony of: 1) social worker Monica Campbell, a member of Mr. Rousseau's treatment team, who had regular and frequent contact with Mr. Rousseau; 2) Dr. Bruce Parsa, M.D., a member of Mr. Rousseau's treatment team, and the staff psychiatrist assigned to Mr. Rousseau's team; 3) Dr. A. E. Daniel, M.D., a psychiatrist retained by Deanna Rousseau to act as a psychiatric resource and consultant related to Mr. Rousseau's treatment for approximately nineteen (19) years, has reviewed approximately five thousand (5,000) pages of records related to Mr. Rousseau, and in addition to meeting with Mr. Rousseau on numerous occasion throughout their nineteen (19) year relationship; 4) Ms. Deanna Rousseau; and 5) Mr. Robert Rousseau. All of these witnesses support Mr. Rousseau's request for conditional release. Additionally, Ms. Danielle Wright provided testimony concerning the living conditions and restrictions under which Mr. Rousseau would live and be assigned, were he conditionally released.

4

In its decision, the circuit court determined that the only medical testimony favoring a denial of conditional release came from Dr. James Reynolds. The court emphasized, however, that Reynolds' contact with Rousseau was limited to a review of Rousseau's file and to a twenty-five-minute conversation with Rousseau. Reynolds further admitted that he had not treated Rousseau as a patient since 2003. In contrast, the court emphasized that the social worker and other medical professionals whose testimony favored release had longstanding involvement in Rousseau's treatment and daily life. Through these points of emphasis, the court ostensibly made credibility determinations that the testimony from medical personnel with a long involvement in Rousseau's treatment should receive greater weight than from those not involved. We agree and give deference to the circuit court's credibility determinations. *Cromer*, 186 S.W.3d at 341; *Gratts*, 112 S.W.3d at 19.

Nevertheless, DMH contends that Rousseau's evidence improperly focused on his unlikeliness to be "violent" or "aggressive" rather than "dangerous," as Section 552.040.12 requires. Dangerous behavior is a broader category than merely violent or aggressive behavior. *See McKee v. State*, 923 S.W.2d 525, 527 (Mo. App. 1996) (finding that the commission of a nonviolent crime may still evince dangerous behavior). Beyond hearing ample evidence that Rousseau was unlikely to be violent, however, the court also heard evidence that: (1) there have been "no reported instances" of any unlawful conduct since 2011; (2) Rousseau was aware of the nature of his 1990 crime, was remorseful for his conduct, and

5

was unlikely to repeat his prior unlawful acts; (3) Rousseau is not a risk to himself or others; (4) Rousseau has actively participated in his treatment and has "been fully compliant with his anti-psychotic medicine regimen"; (5) there have been no reports of any psychotic episodes from Rousseau since at least 2009; (6) "for at least the past decade," Rousseau "has exhibited no symptoms whatsoever of an active mental illness"; (7) under Rousseau's proposed release plan, he would receive continued monitoring, support, and treatment in the facility he would be released to; and (8) Rousseau and his treatment team are aware of the nature of his mental illness and the stressors that exacerbate it, and, in addition to treatment and medication, have a prevention plan in place that aids Rousseau in mitigating those stressors as they arise. This evidence more than fills the gaps between "violence" and "danger."

Moreover, while "dangerous" behavior encompasses more than "violent" behavior, DMH's argument also ignores that evidence of violence and aggression necessarily weighs heavily on a determination of whether a person is likely to be dangerous. Violence and aggression are two of the most recognizable subsets of dangerous behavior. Therefore, while not dispositive, evidence of Rousseau's lack of violent or aggressive behavior is still significant under the circumstances.

DMH also contends that Rousseau's trip to Israel in 1996 tips the scales in its favor. We disagree. DMH relies on evidence that Rousseau was suffering from a psychotic outbreak when he absconded to Israel. Although Rousseau told his case worker at the time that he was "stressed" and his medication needed to be

6

adjusted, he did not directly discuss his psychotic symptoms with anyone. Moreover, the record reveals that no one was aware of Rousseau's psychotic outbreak until after he had returned from Israel and had been arrested. DMH contends that these events are evidence enough to overturn Rousseau's release because of the possibility that he might mask his symptoms and violate his release once again.

While Rousseau's foray to Israel and the circumstances surrounding it weigh against Rousseau's release, they are attenuated by other evidence on the record. Rousseau has "exhibited no symptoms" of psychosis in over a decade. Members of Rousseau's treatment team opine that he will be able to conform his conduct to the law, and will not repeat his prior misconduct, moving forward. Additionally, in 1996, Rousseau himself suggested that he needed a change in medication, presumably to prevent the psychotic outbreak that led him to Israel. Indeed, in a 1996 forensic review following Rousseau's return from Israel, forensic psychologist Dr. Sam Parwatikar noted that Rousseau's 1996 outbreak was likely the result of improper dosages in his medication. The circuit court found that, since then, "[t]he evidence is undisputed that, for at least the past decade, [Rousseau] has actively participated in a myriad of treatment programs, has exhibited no symptoms whatsoever of an active mental illness, and has been fully compliant with his anti-psychotic medicine regimen." The court also found that, under Rousseau's proposed release plan, he would be released to a facility where he would receive continued monitoring and where "medication is taken in front of

7

staff and observed to be ingested"—thus ensuring continued medication compliance. Therefore, evidence on the record supports a finding that Rousseau is unlikely to repeat the events of his 1996 outbreak. The mere possibility of an outbreak on release, without support from additional evidence, does not refute substantial evidence that Rousseau has, and likely will remain, symptom free and treatment compliant on conditional release.

Rousseau has provided evidence that he is unlikely to be violent or aggressive. He has also provided evidence that he has, and will remain, medicine and treatment compliant, and compliant with the law if conditionally released. DMH's evidence to the contrary is attenuated and overshadowed by ample evidence to the contrary. We are left with an abiding conviction that Rousseau's evidence is true, and that it instantly tips the scales in his favor. The circuit court did not err in finding that Rousseau met his burden by clear and convincing evidence. We deny Point I.

In Point II, DMH contends the circuit court erred by erroneously applying the law. Specifically, DMH argues that the court improperly deferred to medical testimony in its decision to grant conditional release. "The determination of whether the evidence satisfies the conditions for release is made by the courts not the treating physicians." *State v. Nash*, 972, S.W.2d 479, 482 (Mo. App. 1998) (quoting *Grass v. Nixon*, 926 S.W.2d 67, 70 (Mo. App. 1996)). DMH relies on two portions of the circuit court's decision to support its contention. The court stated:

8

(1) the eight professionals that make up [Rousseau]'s treatment team concur with [his] request for a conditional release and, presumably attest that [he] meets all legal requirements for receiving a conditional release;

and

(2) [t]he treatment team, as a whole, imply by their support of the application for conditional release (sic) meets the statutory requirements for receiving a conditional release including that [Rousseau] is not likely to commit another violent crime because of this mental illness.

DMH argues that the court's language indicated that it relied on medical testimony alone to reach its decision. Therefore, DMH contends, the court essentially allowed medical testimony to decide whether Rousseau met the requirements of conditional release. This argument ignores, however, the court's detailed findings where it discussed the facts of this case in light of the relevant factors for a grant of conditional release enumerated in Section 552.040.12. Specifically, these factors are:

(1) The nature of the offense for which the committed person was committed;

(2) The person's behavior while confined in a mental health facility;

(3) The elapsed time between the hearing and the last reported unlawful or dangerous act;

(4) The nature of the person's proposed release plan;

(5) The presence or absence in the community of family or others willing to take responsibility to help the defendant adhere to the conditions of the release; and

9

(6) Whether the person has had previous conditional releases without incident.

§ 552.040.12.

Beyond merely relying on the presumptions and implications, as DMH contends, the record reveals the court's thorough consideration of all evidence presented—medical or otherwise. The court ultimately found that Rousseau was unlikely to be violent or aggressive, he was aware of and remorseful for his prior conduct, he had a long history of remaining medicine and treatment compliant, he had long remained lawful and incident free, he had been without psychotic symptoms for over a decade, he would not likely relapse if he continued to remain compliant, he intended to remain compliant, he was aware of his stressors and how to prevent them, and his conditional release would involve continued care and monitoring to ensure his success. We, therefore, find that the court's reliance on these presumptions and implications was not in *isolation*, but rather in *addition to* its own lengthy list of considerations used to reach its decision.

DMH also relies on *Grass v. Nixon*, 926 S.W.2d 67 (Mo. App. 1996), to support its argument. In *Grass*, the Eastern District overturned Grass's conditional release because, while Grass's treatment team recommended his release, the team had not yet determined Grass's specific medical ailment or the stressors that aggravated it. *Id*. at 71. Grass had also only been in treatment for a few years at the time of his release hearing. *Id*. Unlike Grass, Rousseau has been in treatment for over two decades since his last release in 1996. The record also reveals multiple points of evidence supporting that Rousseau and his treatment

10

team are aware of his specific mental ailment, the stressors that exacerbate his ailment, and have a plan in place, in addition to ongoing medicinal treatments, to avoid and combat those stressors. *Grass* is not dispositive to the case before us.

Likewise, DMH relies on *State v. D.W.*, 558 S.W.3d 589 (Mo. App. 2018). This reliance is misplaced, however, because *D.W.* involves an *unconditional* release rather than a *conditional* release. *Id*. at 595. The court in *D.W.* denied an application for unconditional release because, aside from a single family member, the applicant would no longer have a monitoring system in place to ensure she remained treatment and medicine compliant if released. *Id*. at 597. The court was specifically reluctant to cede the State's compliance monitoring duties to a lone family member. *Id*. Here, we are considering a more restrictive conditional release. According to Rousseau's proposed release plan, he would be released to a facility where staff members are present at all hours of the day, where medicine must be ingested in front of staff members, where residents follow various rules and regulations, and where residents receive continued monitoring and care from treatment professionals—among other things. Like *Grass*, *D.W.* is not dispositive to the case before us. The circuit court did not erroneously apply the law. We deny Point II.

## CONCLUSION

The judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.